2 Ill. App.3d 35 (1971)
275 N.E.2d 756
RAULAND DIVISION, ZENITH RADIO CORPORATION, Plaintiff-Appellant,
v.
THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Defendant-Appellee.
No. 54888.
Illinois Appellate Court  First District.
October 6, 1971.
*36 W. Gerald Thursby, of Chicago, (Hackbert, Rooks, Pitts, Fullagar and Poust, of counsel,) for appellant.
Allen S. Lavin, of Chicago, (Stanford R. Gail, of counsel,) for appellee.
Judgment affirmed.
Mr. JUSTICE BURMAN delivered the opinion of the court:
The plaintiff, Rauland Division, Zenith Radio Corporation (hereinafter Rauland) instituted this action on December 15, 1969, to vacate an administrative decision of the defendant, the Metropolitan Sanitary District of Greater Chicago (hereinafter District) which ordered Rauland (1) to reduce the lead content of the effluent discharged into the District's sewage system to 0.5 parts per million and (2) to "cease and desist from discharging pollutants" into the District's sewers. The Circuit Court, after reviewing the entire record, entered an order which affirmed the decision of the District; and Rauland appeals.
The administrative proceedings involved herein were conducted before the Board of Trustees of the District in accordance with and pursuant to the Industrial Waste Ordinance of the Metropolitan Sanitary District of Greater Chicago. Rauland initially challenges the authority of the District to pass an ordinance which empowers it to hold administrative hearings and to pass "cease and desist" orders with respect to discharges of effluent into the District's sewers.
According to Section 1, Article 1 of the Industrial Waste Ordinance, "[t]he intent and authority for this ordinance is provided in Chapter 42 Paragraphs 323 and 326 to 326-bb inclusive of the Illinois Revised Statutes * * *."
Paragraph 323 (Ill. Rev. Stat. 1969, ch. 42, par. 323) provides in part:
"The board of trustees has full power to pass all necessary ordinances, orders, rules, resolutions and regulations for the proper management and conduct of the business of the board of trustees and the corporation and for carrying into effect the object for which the sanitary district is formed."
Paragraph 326 (Ill. Rev. Stat. 1969, ch. 42, par. 326) provides in part:
"The board of trustees * * * shall have power to provide for the *37 drainage of such district of both surface water and sewage, by laying out, establishing, constructing and, maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including sewage) of such district * * * and in the case of the Sanitary District of Chicago * * * some efficient method of treating sewage other than by water dilution shall be annually provided to create an effluent thereof which shall not be offensive or injurious to the health of any of the people of the State * * *."
Paragraph 326bb(8) (Ill. Rev. Stat. 1969, ch. 42, par. 326bb(8)) provides in part:
"(8) Order to discontinue discharge  notice  hearing. Whenever the sanitary district acting through the general superintendent determines that sewage or industrial wastes or other wastes are being discharged into any waters and when, in the opinion of the general superintendent such discharge pollutes the same or renders such waters incapable of use for the purposes stated herein, the general superintendent shall by conference, conciliation and persuasion, endeavor to the fullest extent possible to eliminate such violation.
In the case of the failure by conference, conciliation and persuasion to correct or remedy any claimed violation the general superintendent may order whomsoever causes such discharge to show cause before such board why such discharge should not be discontinued. * * * Such Board of Trustees may take evidence with reference to the said matter and after reviewing such evidence such Board of Trustees may issue an order to the party responsible for such discharge, directing that within a specified period of time such discharge be discontinued * * *."
In Paragraph 326bb(1) (Ill. Rev. Stat. 1969, ch. 42, par. 326bb(1)) waters are defined as "all waters of any river, stream, water course, pond or lake wholly or partly within the territorial boundaries of such sanitary district."
Although the District is expressly authorized in section 326bb(8) to conduct hearings and to issue orders with respect to the discharge of pollutants into waterways within the District, there is no express authorization contained in the act for the District to conduct administrative proceedings and issue "cease and desist" orders with respect to the discharge of pollutants into the district's interceptor sewers. Rauland contends that the District cannot conduct such proceedings with respect to discharges into sewers without express statutory authorization, and it urges that "[t]he proper forum to hear matters such as are involved in the instant case is a court."
*38  1, 2 A governmental agency or municipal corporation possesses not only those powers which are expressly delegated to it, but also those which are necessary for the proper exercise of the functions with which it is entrusted. (Strub v. Village of Deerfield, 19 Ill.2d 401, 167 N.E.2d 178, People ex rel. County of DuPage v. Smith, 21 Ill.2d 572, 173 N.E.2d 485.) In Strub the validity of a village ordinance which limited to two the number of scavenger licenses that may be in force at anytime in the village was upheld. The Court in considering the contention that the village had no authority to pass the ordinance stated, 19 Ill.2d at 403, 167 N.E.2d at 179, that "[i]t is a commonplace principle that a municipal corporation can exercise those powers necessarily implied in or incident to the powers expressly granted * * *."
Likewise in Smith where it was held that the authority to construct a sewage treatment plant was implied in the general grant of power to regulate the disposal of sewage and to construct sewers, the Court with regard to the power of the county to construct the plant stated, 21 Ill.2d at 580, 173 N.E.2d at 490:
"While it is true a municipal corporation has only such powers as are conferred upon it by the General Assembly, (Village of Kincaid v. Vecchi, 332 Ill. 586) it is at the same time a commonplace principle of statutory construction that the legislative grant of power carries with it the right to use all means and instrumentalities necessary to the beneficial exercise of the expressly conferred powers."
The District can exercise not only those powers which are expressly delegated to it, but also those which are implied in its legislative grant. In the present case, we must consequently determine whether the District is authorized by implication to conduct hearings and to issue orders with respect to discharges into the sewers.
The District in addition to the powers set forth in section 326bb(8) is expressly authorized to lay out, construct, and maintain outlets for the disposal of drainage and sewage, and it is required to provide an efficient method of treating sewage so as to create an effluent which is not offensive or injurious to the health of the people of the State. (Ill. Rev. Stat. 1969, ch. 42, par. 326.) It is necessarily implied from these expressly granted powers that the District has the power to control the effluent discharged into sewer system because the discharge of toxic substances can and does affect (1) the operation of the District's facilities and (2) the purity of the effluent eventually discharged by the District into the waters and watercourses.
The District is also expressly authorized to carry its object into effect by passing orders (Ill. Rev. Stat., 1969, ch. 42, par. 323), and it is necessarily implied in this expressly granted power to pass orders which *39 affect individuals that the District can hold hearings to determine which orders should be passed.
 3 In summary, the General Assembly has, by necessary implication, tuthorized the District to regulate discharges into the sewer system and to pass all ordinances and orders necessary to secure, preserve, and promote the public health. We hold that the District has authority to enact an ordinance which empowers it to hold hearings and to issue "cease and desist" orders with respect to effluent discharged into sewers under its control.
Rauland relies, in support of its contention that the District can act only as expressly authorized by statute, upon People ex rel. Illinois Highway Transportation Co. v. Biggs, 402 Ill. 401, 84 N.E.2d 372, Oliver v. Civil Service Commission, 80 Ill. App.2d 329, 224 N.E.2d 671, and Appeal Board of the Department of Environmental Control of the City of Chicago v. United States Steel Corp. 272 N.E.2d 46. In both Biggs, which considered the propriety of granting a writ of mandamus, and Oliver, which considered whether an administrative agency had inherent powers, there is language which indicates that an administrative agency had inherent powers, there is language which indicates that an administrative agency or municipal corporation can act only as expressly authorized. These cases are not controlling here because in neither case was the Court presented specifically with the contention that an agency or municipal corporation had authority to act in a manner necessarily implied from the powers delegated to it. In United States Steel, the Court held that the power to issue subpoenas could not be implied from a simple grant of authority to pass ordinances; but in making this holding the Court recognized that a municipal corporation possesses not only those powers expressly granted to it, but also those necessarily implied from or incident to the powers expressly granted.
 4 It is next contended that the order of the District's Board of Trustees should be reversed because the Board failed to make findings in support of its decision. Rauland argues that written findings are required by "(1) Section 11 of Administrative Review Act (Ill. Rev. Stat. ch. 110, par. 274) which provides that `findings and conclusions of the administrative agency on questions of fact shall be held prima facie true and correct' and (2) the due process provisions of the Illinois and United States Constitutions because such findings are necessary for orderly, efficient, effective, fair and just review."
The record reveals that the Committee on Industrial Waste and Water Pollution of the District's Board submitted a written report to the Board on November 3, 1969, which contained (1) a proposed order, (2) recommendations made by the committee itself and by the District's General *40 Superintendent that the order be passed, and (3) a letter dated September 23, 1968, from the Acting Chief Engineer which contained findings and recommendations resulting from the hearing. The Board of Trustees adopted the order as proposed by the committee; and as part of the order it found generally that Rauland was violating the Industrial Waste Ordinance, and it directed that the letter from the Acting Chief Engineer be printed in full in the record of proceedings. We are satisfied that the administrative proceedings and the findings of the Board were sufficient and adequate to permit an orderly and efficient review of the Board's decision.
Rauland next contends that the evidence introduced at the hearing was insufficient to establish a violation of the Industrial Waste Ordinance. The ordinance prohibits the discharge of "water or wastes containing toxic substances in quantities which are sufficient to interfere with the biological processes of the sewage treatment works." (Article III, Paragraph 3(e) Industrial Waste Ordinance.) Toxic substances are defined as "any substance whether gaseous, liquid or solid which when discharged to the sewer system in sufficient quantities will interfere with any sewage treatment process, or will constitute a hazard to human beings or animals, or will inhibit aquatic life or create a hazard to recreation in the receiving waters of the effiuent from the sewage treatment works of the Sanitary District." According to the testimony of Stanley W. Whitebloom, a pollution control officer, the maximum amount of lead which may be discharged into the sewage system under the standard applied by the District is 0.5 part per million.
Rauland was first contacted with regard to its discharges into the waterways and into the District's sewers in March of 1968. During the following year there were conferences and correspondence between personnel from Rauland and from the District, and a problem concerning the discharge of process waters into storm sewers was resolved. On October 1, 1968, Joseph Pieczara, Rauland's plant engineer, submitted a letter to the District which outlined Rauland's "program to insure proper processing of water flowing into the sewers," and on February 14, 1969, Pieczara submitted in another letter an eight step plan and schedule for the design and construction of an effluent treatment system which was to be completed and operational by November 1, 1969. Rauland did not follow and maintain its arranged schedule, and a meeting was held on May 22, 1969, between representatives of Rauland and of the District. At that meeting, according to a letter sent by Pieczara, Rauland explained that the delay was due to labor difficulties and to the introduction of a new manufacturing process, and Rauland agreed to install temporary equipment which would bring the material content *41 of the effluent discharged into conformity with the standard contained in the proposed sewage and waste control ordinance (i.e. which would reduce the lead content of the effluent to 0.5 parts per million) by July 15, 1969. Samples were taken of the effluent discharged into the sewers by Rauland from July 22, 1969, to July 30, 1969, and these samples showed that the effluent discharged contained 0.64 to 2.60 parts of lead per million.
Joseph Pieczara, testified that he reviewed the efforts made by Rauland to alleviate its problems relating to the discharge of wastes. He stated with regard to the lead in the effluent that "[w]e have had demonstrations through our tests that we are under.5 parts per million, but not consistently as of this date." He estimated that with the installation of a filter system the lead problem could be eliminated in 15 to 30 days.
Glen Smith, an analytic chemist employed by Rauland, reviewed the technical improvements made by the corporation to reduce pollutants in the effluent created by its manufacturing. On cross-examination he stated that he made some analysis toward the end of 1968 which showed that the lead content of the effluent exceeded 0.5 parts per million. He estimated that it would take ten weeks to solve the then current lead problem.
The evidence introduced at the hearing, both by Rauland and by the District shows that Rauland was discharging effluent containing in excess of 0.5 parts of lead per million. Rauland argues that this evidence does not establish that it discharges "waters containing toxic substances in quantities which are sufficient to interfere with the biological processes of the sewage treatment works," as prohibited by Article III, Paragraph 3(e) of the Industrial Waste Ordinance.
Long before the administrative hearing in September, 1969, the District informed Rauland that effluent containing more than 0.5 parts of lead per million could not be discharged into the District's sewers, and Rauland agreed to reduce the lead content of its discharge to that amount. This enforcement standard of 0.5 parts of lead per million was not adopted arbitrarily, but was the result of a study made with the assistance of industry in which it was determined that discharges of industrial waste containing quantities of lead in excess of 0.5 part per million would interfere with the biological processes of the sewage treatment works.
 5 On several different days in July, 1969, the District sampled Rauland's discharge into the sewer system, and on each occasion found lead in excess of 0.5 parts per million. This sampling along with the admissions of Rauland's plant manager and analytic chemist established *42 the existence of discharges in violation of the District's enforcement standard, and no evidence was introduced to show that this standard was unreasonable. We conclude that the evidence was sufficient to prove a violation of the Industrial Waste Ordinance.
Rauland also claims that the Board considered incompetent evidence in arriving at its decision. The District in the latter part of July, 1969, collected samples of the effluent discharged from Rauland's plant into the sewage system, and these samples were chemically analyzed. Rauland argues that its right to a fair and impartial hearing was prejudiced when the Board permitted Stanley Whitebloom, a pollution control officer, to testify concerning the test results even though he was not present when the samples were collected and even though he could not testify that the chemical analyses were properly performed.
 6, 7 The same strict rules with reference to the admissibility of evidence do not apply in proceedings before administrative agencies. Mitchell v. Sackett, 27 Ill. App.2d 335, 169 N.E.2d 833, and under Section 12(2) of the Administrative Review Act (Ill. Rev. Stat., 1969, ch. 110 par. 275(2)) the failure to observe the technical rules of evidence does not constitute grounds for reversal of an administrative decision unless it appears that the failure to observe the rules materially affected the rights of a party and resulted in substantial injustice to him. Rauland had access to the samples which were collected by the District because on each day after the first sample was taken the District thereafter split its samples so that Rauland could conduct its own tests and analysis. Moreover, John Tomaras, a field supervisor of the District's Industrial Waste Division, testified that he supervised the collection of the samples and that proper procedure was followed. Even if the evidence were improperly admitted, we cannot say, after considering all the facts and circumstances, that Rauland's rights were materially affected or that it suffered substantial injustice.
We find no merit to Rauland's final contention that it was deprived of due process because it was not apprised of the case against it. The record before us shows that Rauland, as a result of lengthy consultations with the District, was fully aware of its problems relating to the discharge of industrial wastes long before the administrative hearings in September of 1969.
For the reasons set forth above, the judgment of the Circuit Court is affirmed.
Judgment affirmed.
ADESKO, P.J., and DIERINGER, J., concur.