RAULAND DIVISION, ZENITH RADIO CORPORATION, Plaintiff-Appellant, *v.* THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Defendant-Appellee.

(No. 55614;

First District—January 4, 1973.

866

Hackbert, Rooks, Pitts, Fullagar and Poust, of Chicago, (W. Gerald Thursby, of counsel,) for appellant.

Allen S. Lavin, of Chicago, (Sanford R. Bail, of counsel,) for appellee.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

In 1968, Zenith Radio Corporation's Rauland Division was ordered to stop discharging pollutants into the sewers of the Metropolitan Sanitary District of Greater Chicago. The order was affirmed in the Circuit Court and by this court in *Rauland Division, Zenith Radio Corp. v. The Metropolitan Sanitary District of Greater Chicago* (1971), 2 Ill.App.3d 35, 275 N.E.2d 756. Further violations of the district's anti-pollution ordinance occurred and in 1970 the board of trustees of the district again ordered the corporation to cease and desist. It was also ordered to cease polluting the district's waterways. In an administrative review proceeding the Circuit Court affirmed the order and, once more, Rauland appeals.

Five points are raised: (1) the district is not empowered by law to conduct administrative proceedings, hold hearings and issue orders concerning discharges into its sewers; (2) the district's board of trustees did not personally conduct the hearing against the corporation; (3) the district's evidence did not prove a violation of its ordinances; (4) the cease and desist order did not contain adequate findings of fact and (5) the order was too broad and indefinite.

■■ Points (1) and (4) may be disposed of summarily. Point (1) was raised in Rauland's first appeal and was rejected by this court. Although we have considered Rauland's contention, we find no reason to disagree with our previous determination. The order protested in point (4) is similar in form and content to the one considered in the first appeal. The findings in that order were held by this court to be sufficient to permit an efficient review of the board's decision. No persuasive reason has been presented to cause us to deviate from the result reached in the earlier appeal.

Although Rauland contended in point (1) that the district had no authority to hold administrative proceedings in respect to pollutants discharged into its sewers, it concedes in point (2) that the district has this authority regarding contaminants discharged into its waterways. However, in point (2) it contends that conducting such hearings is a non-delegable function and that it was error for an assistant engineer of the district to conduct the show-cause hearing instead of the board itself.

Ill. Rev. Stat. 1969, ch. 42, par. 326(bb) (8), authorizes the district to hold hearings regarding the discharge of sewage and industrial waste into "any waters." In support of its contention Rauland relies on sub-paragraph (11) of paragraph 326 which provides: "The Board of Trustees may conduct the hearing and take the evidence provided for in sub-paragraph 8 of this Section for action thereon." First, it must be noted that sub-paragraph (11) does not prohibit a delegation of the board's authority to conduct hearings; it says that the board *may*, not that it *shall* conduct the hearing. Second, sub-paragraph (11) states that any member of the board or designated officer or employee may issue notices of hearings and examine witnesses. This could be interpreted as permitting an employee to conduct the hearings as well. Third, if any ambiguity exists it can be resolved by examining the intention of the legislature as reflected in the statutes enacted before and after 1969.

In 1945, when the original form of paragraph 326(bb) was enacted, sub-paragraph (11) stated in part: "The Board of Trustees, or any member thereof, or any officer or employee designated by the Board of Trustees for that purpose, may conduct the hearing and take evidence provided for in sub-paragraph 8 hereof, and transmit a report of said evidence and hearing, together with his recommendations, for review to the Board of Trustees for action thereon." In the 1969 revision of paragraph 326(bb) the legislature no longer specifically provided that a designated officer or employee could conduct the hearing, although as noted above such an employee was empowered to examine witnesses. In 1971 the language empowering an officer or employee of the board to conduct a hearing was re-introduced into the statute, thus explicitly permitting the board to delegate the evidence-taking function to an officer or employee. Ill. Rev. Stat. 1971, ch. 42, par. 326(bb) (11).

■■■ The intention of a prior legislative act may be ascertained by the language of a subsequent act of the same law-making body. (*Lawrence v. People ex rel. Foote* (1900), 188 Ill. 407; *People ex rel. Malone v. Mueller* (1946), 328 Ill.App. 593, 66 N.E.2d 516.) We interpret the legislature's prompt return to its 1945 statutory language as intending to clarify the possible ambiguity arising from the 1969 statute. Considering the legislative history of sub-paragraph (11), the 1969 language does not sufficiently disclose a legislative intention to deprive the board of a power which it exercised for nearly a quarter of a century. It seems more reasonable to assume that the omission was a result of inadvertence rather than a radical departure from the general legislative intent. *Cf. Murphy v. Police Board of City of Chicago* (1968), 94 Ill.App.2d 153, 236 N.E.2d 344.

■■ By the board's resolution of December 23, 1969 (Board of Trustees'

1969 proceedings, p. 1337), the responsibility for selecting its hearing officers was placed upon its chief engineer. The adoption of this resolution was not an abuse of discretion but merely an expeditious method "for the proper management and conduct of the business of the board of trustees" which the board was authorized to enact under the power granted it by the legislature. (Ill. Rev. Stat. 1969, ch. 42, par. 323.) The selection of an assistant engineer to preside at the Rauland hearing was not improper.

In point (3) Rauland asserts that the evidence was insufficient to prove that it violated the district's 1969 Waste Control Ordinance. Two of its assertions are directed to discharges into waterways; two are directed to discharges into waterways and sewers. The former are: the inapplicability of the district's standards to Rauland's discharges, and the lack of proof that the contaminants in its discharges exceeded those of the district itself. The latter two, common to both the waterway and sewer discharge violations, are: the inadmissibility of evidence and inadequate conciliation proceedings. The four assertions will be discussed in the order stated.

In Appendix A of the 1969 ordinance, the Metropolitan Sanitary District adopted the water quality standards and criteria as promulgated by the Sanitary Water Board in its regulations SWB-7, 11, 14 and 15, "as applicable to the respective waters, water-courses, and natural outlets." To establish Rauland's non-compliance with the applicable criteria the district produced analyses of the effluents discharged into storm sewers from Rauland's facilities. The storm sewers emptied into Silver Creek, an intrastate waterway located near the Rauland plant.

■■ Rauland asserts that the standards for discharges of effluents should not apply to its storm sewer discharges, since these did not result from manufacturing processes but consisted for the most part of storm water runoff from rains and melting snow. According to Webster's Third New International Dictionary (1967 Edition), "effluent" is defined as: "something that flows out as * * * (b) liquid discharged as waste (as water used in an industrial process or sewage.)" This definition does not compel us to construe the word "effluent" so narrowly as to make it applicable only to water used in manufacturing. There was testimony that water from sump pumps was discharged into storm sewers. There was testimony that drainage water from a sprinkling system and water from a recirculating cooling system could be emitted into these sewers. Also, Rauland owns large parking lots where its employees park their automobiles while working at the plant. Water drains from the parking lots into the storm sewers emptying directly into Silver Creek. When this occurs the pollutants which have collected in the parking lots also enter the storm

sewers and pass into Silver Creek. As Rauland makes these parking facilities available to its employees we cannot hold that Rauland lacks responsibility for the pollution which results from their use. Therefore, Rauland must comply with the effluent standards for discharges into Silver Creek.

■■ Rauland and the district disagree as to the applicability of particular Sanitary Water Board Regulations governing effluent discharges. As Silver Creek is an intrastate waterway Rauland argues that SWB-14 entitled "WATER QUALITY STANDARDS Intrastate Waters Exclusive of Interstate Waters" is the section which controls its discharges. Apparently there is no dispute that Rule 1.08, par. 11(b) of SWB-14 sets forth the effluent standards for suspended solids discharged into Silver Creek. However, Rauland asserts that it need not meet the standard, since, it suggests, the provision will not become effective until a time schedule is fixed according to par. 15 of Rule 1.08. This argument is without merit as the 1969 Sewage and Waste Control Ordinance merely adopted the water quality standards and criteria as set forth in the Sanitary Water Board Regulations, but in no way bound the district by other provisions governing such matters as the date upon which a regulation would be enforced. Thus, Rauland must comply with the SWB-14 standard for the discharge of suspended solids.

■■ In addition, the effluent standards in SWB-15 also must be applied to Rauland's discharges. It is true that SWB-15 is entitled "WATER QUALITY STANDARDS Interstate Water, Chicago River and Calumet River System and Calumet Harbor Basin," and that Silver Creek does not fit into these classifications. However, par. 10(c) of Rule 1.07 begins, "Effluents to waters of the State within the Metropolitan Sanitary District of Greater Chicago are not to exceed the following specific characteristics at any time." A list of the effluents is then presented, generally stating their maximum possible concentration in milligrams per liter. The fact that paragraph 10(c) speaks without exception of "waters of the State within the Metropolitan Sanitary District" leads us to conclude that this provision was intended to encompass both intrastate and interstate waters within its coverage.

Therefore, if the district's evidence established, as it did, that Rauland's storm sewer discharges contravened the effluent standards of SWB-14 or 15, a violation of the 1969 Sewage and Waste Control Ordinance could be properly found. This would also be the case if the evidence showed, as it did, that Rauland's discharges to the sanitary sewers violated the maximum concentrations acceptable for such discharges in Appendix B of the district's Sewage and Waste Control Ordinance, the applicability of which Rauland does not dispute.

■■ Rauland also contends that for it to be found guilty of pollution the district must establish that Rauland's discharges exceeded those of the district in their content of sewage, industrial wastes, or other wastes. It bases this contention upon the definition of pollution set forth in Ill. Rev. Stat. 1969, ch. 42, par. 326(bb)(1), as, "the discharge or deposit in or upon such waters or sewage, industrial wastes, or other wastes * * * all beyond the content of such like substances present in an equal volume of the effluent discharged from the sewage treatment works of any such sanitary district." Rauland's interpretation does not place the necessary emphasis on the succeeding portion of the statute which states: "The sanitary district * * * shall determine what discharge or deposit of sewage, industrial wastes, or other wastes, constitutes pollution as herein defined, and shall establish standards, which shall be of a degree not less than the minimum water quality standards set forth by the Sanitary Water Board, * * *." The district complied with this statute by adopting its 1969 Sewage and Waste Control Ordinance, the purpose of which was, according to Article I, "the protection of the public health and safety by abating and preventing pollution * * *." The district was undoubtedly aware of the equivalency standard when it adopted its pollution regulations. As the district's ordinance thus established the criteria to "determine what deposit of * * * wastes constitutes pollution," required by the legislature, we will not place upon the district the burden to demonstrate at each show-cause hearing that its discharges contained smaller amounts of pollutants than those of the alleged violator of the ordinance.

■■ Having carefully considered the evidence, we find that it sufficiently established that Rauland's storm sewer discharges violated Sanitary Water Board Regulations 14 and 15 as incorporated in the 1969 Sewage and Waste Control Ordinance, and that its sanitary sewer discharges contravened Appendix B of the ordinance.

Rauland, however, questions the admissibility of much of the evidence upon which the above finding is based. Testimony and exhibits presented by the district established through chemical analyses that samples taken from Rauland's storm sewers violated the effluent standards set forth in SWB-14 for suspended solids and in SWB-15 for hexane solubles and lead. Similar analyses disclosed that Rauland had breached the district's standards for lead and pH (a measure of acidity and alkalinity) discharged into its sanitary sewers.

Rauland objected to the admission of the testimony and exhibits because the employees of the district who had taken the samples and the employees who had analyzed the samples were not called to testify. The district introduced testimony by one of its pollution control officers who

supervised the sampling program conducted at the Rauland plant in December 1969. With the assistance of Rauland's plant engineer, he determined the proper locations to take the samples, instructed the district's samplers how often the samples were to be taken and frequently observed the sampling operations. The officer discussed in detail the method of sampling that was used and stated that after the samples were taken they were divided with Rauland. He testified that he knew of his own knowledge that when the samples were collected they were tagged and sent to the district's laboratory for analysis.

The assistant supervisor of the district's quality control laboratory was present at the laboratory in December 1969 and supervised the chemical analyses of the samples. He did not perform the analyses himself but he observed them being run by about 20 analysts working under him. In his testimony he fully described the methods used to ascertain the chemical content of the samples.

■■■ We must reject Rauland's argument that the analyses should have been excluded from evidence based upon objections arising primarily from the district's failure to produce its samplers and analysts at the hearing. It is provided in Ill. Rev. Stat. 1969, ch. 110, par. 275(2), that: "Technical errors in the proceedings before the administrative agency or its failure to observe the technical rules of evidence shall not constitute grounds for the reversal of the administrative decision unless it appears to the trial court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him." This court has stated that the same strict rules concerning the admissibility of evidence do not apply to proceedings before administrative agencies. *Rauland v. Metropolitan Sanitary District*, 2 Ill.App.3d 35, 275 N.E.2d 756; *Mitchell v. Sackett* (1960), 27 Ill.App.2d 335, 169 N.E.2d 833.

■■ One further contention pertaining to the admissibility of evidence must be discussed. Rauland objected to the testimony concerning the lead content of its discharges because the method of analysis used by the district was not set forth in the then current edition of *Standard Methods for the Examination of Water and Waste Water*. Article III, section 2, of the district's 1969 Sewage and Waste Control Ordinance states:

> "In order to ascertain whether or not the sewage or waste of any kind discharged by any person into any waters, * * * conforms to the criteria or water quality standards of the District, the District may use any appropriate method or device which will lead to such a determination. If and when feasible, all measurements, tests and analyses of the waters, sewage and wastes of any kind shall be determined in accordance with the latest edition of *Stand-*

*ard Methods for the Examination of Water and Waste Water* * * * *"

The edition of *Standard Methods* available at the time of the hearing provided for a completely wet analysis for determining the presence of lead, but the district used a method by which a spectrophotometer was inserted into a preserve bottle containing the sample. The district's assistant laboratory supervisor testified that this procedure was more feasible than that suggested in *Standard Methods* and Rauland's chemist agreed that it was reliable. In its brief the district pointed out that its method of analysis has been included in the 1971 edition of *Standard Methods* and Rauland has not controverted this statement. Although the hearing officer should have required the district to either prove the lead content by the analytical method prescribed in the prevalent edition of *Standard Methods* or prove that such method was not feasible, his failure to do so was not prejudicial to Rauland. The method used by the district is currently approved, Rauland's chemist agreed it was reliable, and the accuracy of the district's analysis is not disputed.

Rauland also contends that the district did not abide by the terms of its 1969 Sewage and Waste Control Ordinance requiring conciliation efforts before administrative proceedings were begun against it. Article IV of the ordinance provides: "* * * when, in the opinion of the General Superintendent, such discharge pollutes the same or interferes with the effective operation of the sewage system of the District, the General Superintendent shall by conference, conciliation or persuasion, endeavor to the fullest extent possible to eliminate or remedy such violation." The ordinance was adopted on September 18, 1969. Prior to this date representatives of Rauland and the district met on several occasions. On May 22, 1969, the parties met in the district's office to discuss the discharges from the Rauland plant and the interim measures necessary to bring Rauland into compliance with the district's standards. The district told Rauland that it intended to enforce the effluent standards contained in regulations 14 and 15 of the Sanitary Water Board, and Rauland was informed of the standards for discharges of lead and pH used by the district. Furthermore, Rauland was apprised of the contents of the proposed sewage and waste control ordinance.

After the ordinance went into effect, the district took new samples of the contents of the sanitary and storm sewers at the Rauland plant and shared them with Rauland. It did not convene the show-cause hearing until March 1970.

■■ We find that the district met its burden of showing its attempts at conciliation. Although the conference with Rauland took place prior to the adoption of the ordinance, the district has demonstrated its good-

faith attempt to resolve the dispute. Rauland was informed of the requirements to be met in order to comply with the district's standards, and it was unnecessary for the district to repeat the unsuccessful conciliation conferences simply because the proposed ordinance had been adopted.

■■ Rauland's fifth point (5) concerns the breadth of the district's order. Rauland was commanded to cease and desist discharging pollutants into the sewer system and waterways under the district's jurisdiction and to comply with the district's Sewage and Waste Control Ordinance in respect to such discharges. The ordinance specifically defined pollution as the discharge of wastes in excess of the limits and standards set forth in the appendixes of the ordinance. The ordinance and the regulations adopted thereunder provide sufficiently well-defined standards. The order was not vague; it could not be misunderstood by anyone disposed to comply with it. Many samplings of Rauland's sewage and industrial discharges had been made, starting as early as March 1968. The samples were obtained at three different locations and were divided equally between Rauland and the district for analysis in their own laboratories. Numerous consultations took place between the parties; abatement agreements were made and broken; compliance schedules were set and violated. Rauland knew the standards it had to meet and it knew the components of its own wastes to which the district objected. That the order allowed Rauland freedom in choosing the methods of achieving compliance is not error and is not something about which Rauland can complain.

■■ The scope of review upon appeal from an administrative decision is limited. A reviewing court cannot substitute its judgment for that of the administrative agency if there is substantial evidence in the record to support the agency's findings. Its findings of fact cannot be overturned unless they are against the manifest weight of the evidence. (*Brewton v. Civil Service Com.* (1969), 115 Ill.App.2d 460, 253 N.E.2d 504; *Coursey v. Board of Fire and Police Commrs.* (1967), 90 Ill.App.2d 31, 234 N.E.2d 339.) The decision of the Board of Trustees of the Sanitary District that Rauland was guilty of violating its anti-pollution ordinance was supported by substantial evidence.

The judgment of the Circuit Court is affirmed.

Affirmed.

McNAMARA and McGLOON, JJ., concur.