ROBERT HRUBY *et al.*, Plaintiffs-Appellants, *v.* THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF BERWYN *et al.*, Defendants-Appellees.

(No. 58095; ■■■■■■)

First District (1st Division)—September 16, 1974.

Adamowski, Newey and Riley, of Chicago (Francis X. Riley, of counsel), for appellants.

Walter C. Wellman, of Lyons, for appellees.

Mr. JUSTICE HALLETT delivered the opinion of the court:

Achilles Chiapetta and Robert Hruby were police officers (patrolmen) of the City of Berwyn. They and police officers Charles Honsik and Charles Estes investigated a break-in at a Sears store and were subsequently charged, in substance, with improperly removing a color TV, a stereo tape player and some toys, thereby engaging in "conduct unbecoming a police officer." After a full hearing, the Board of Fire and Police Commissioners found them guilty and discharged them from their said civil service offices.

Chiapetta and Hruby sought judicial review of said administrative

decision and Honsik and Estes also sought similar relief in a separate action. The two actions were consolidated and heard together.

As to Honsik and Estes, the trial court remanded the matter to the Board for a limited hearing and their case is not before us. As to Chiapetta and Hruby, the trial court affirmed the Board's findings and decision and they have appealed, contending in substance:

> (1) That the Board's findings and its decision discharging them from their offices, are not supported by and are contrary to the manifest weight of the evidence; and that the trial court therefore erred in affirming said decision.

> (2) That they were denied a fair trial by the Board (a) in refusing to sever their trial from that of Officers Honsik and Estes; (b) by not having a more specific Bill of Particulars furnished them; and (c) by allowing the hearing to go on for some four months and over 1000 pages of transcripts; and that the trial court therefore erred in affirming the Board's decision.

■■ We conclude: (1) that the Board's findings and decision are supported by and are not contrary to the manifest weight of the evidence; and (2) that the contention that, for various reasons, the Board did not give them a fair trial not only was not presented below but is without merit. We therefore affirm.

### The Facts

Chiapetta, Hruby, Honsik, and Estes were police officers (patrolmen) of the City of Berwyn and all were on duty on the 11 P.M. to 7 A.M. shift on October 30-31, 1969. Chiapetta was driving squad car 68, which was being used as car 63, with Hruby as his partner and they had never been teamed up before. Between 4:30 and 4:35 A.M., they had not given or received any radio transmission although the operator had tried several times to contact them. Chiapetta and Hruby explain this hiatus by testifying that at about 4:30 A.M. they left their squad car at Home Avenue near 24th Street to investigate a couple kissing in a parked car, which took a few minutes. No names or license numbers were taken or report made and, as they returned to their squad car they heard the call from the station, to which they responded. At the trial there was testimony that they should not have left their car unattended without reporting that they were doing so and where and why.

When they responded, Ochsner told them to go to Dunkin Donuts at East Avenue and 22nd (Cermak) and pick up coffee and doughnuts for the station. According to Chiapetta and Hruby, they started north on Home Avenue and were stopped for a traffic light at 22nd (Cermak)

when they noticed, to their right, that the wire gate in the cyclone fencing which surrounded the outdoor garden section of Sears store in the Cermak Shopping Plaza was open and swinging in the wind. They backed up and parked next to that fence. It was then about 4:50 A.M. and Chiapetta turned off the lights and the radio and removed the ignition key which he put in his belt. Both got out and went in to investigate the Sears area, without advising the radio operator at the station that they were leaving their squad car unattended. According to testimony at the trial, this was not proper police practice.

They then went through the open gate into the open air garden station, which was full of trees and bushes and a trailer. After checking it out, they noticed that a wood door into a lean-to addition had been pried open. This lean-to was 5 feet deep and some 40 feet long and 7 feet high at the door. It had a slanting roof and an overhang. The door was about 4 feet wide. According to their testimony at the trial, an 18-inch Sears color television and a Sears stereo tape player with two extension speakers were in the doorway, half in and half out, being rained on and blocking the passage. Their subsequent handwritten reports of the incident state, however, that the TV and tape player were found inside the door. This lean-to was piled some 6 feet high with Christmas trees and ornaments, with a passageway about 3 feet wide through it.

Five feet beyond the wood door was a set of double glass doors some 6 feet wide, leading to the toy section. According to Chiapetta and Hruby, the lower half of the right door was broken and they drew their service revolvers and climbed through the door into the toy section. Again, they did not, as yet, go back and let the radio operator at the station know what they had seen or what they were doing, which would have been the better police procedure. According to Chiapetta and Hruby, they then checked out the toy section, which was about 50 feet by 200 feet and they noticed that a second set of glass doors, leading into the main store, was also smashed and they crawled through it into the main store, some 250 by 500 feet. Another television set was standing in the aisle in front of them and Hruby picked it up and moved it out of the way, contrary to usual police practice. After some 3 to 5 minutes checking, they concluded that those who had broken into the store were probably still in there and Chiapetta started back to call the station, leaving Hruby in the toy section.

According to Chiapetta, as he went out through the two doors and the wood door, he came across the TV and the tape player in the door of the lean-to and picked up the TV and carried it out to his squad car and put it in the back seat, because it was wet and blocking the passage and could not be put elsewhere.

In the meanwhile, Detective Russ was patrolling the area and shortly before 5 A.M. was going east on Cermak Road and came to the Shopping Plaza and the Sears store, where he saw squad car 68 parked near the fence without lights. According to his testimony, he saw Chiapetta coming out of the Sears garden section carrying three boxes, which he put down next to his squad car. Russ also testified that Chiapetta then saw him and got into the squad car, turned on the radio and reported the break-in at the Sears store at the Shopping Plaza. The time was 5:02 A.M.

In any event, Russ asked Chiapetta what happened and Chiapetta told him that they had found the open gate and broken doors and had checked out the toy section and that he and Hruby thought that those who had broken in might still be in the main store. He admits that he did not tell Russ or Sergeant Bartunek of the TV and tape player in the back of his squad car but testified that Russ flashed his flashlight into the back of the car and saw them. Russ, on the contrary, testified that he did not see the TV or the tape player until they were returned to the Sears store some time later.

At this juncture, Sergeant Bartunek, who had been advised of the break-in by the radio operator joined them and Chiapetta repeated what he had told Russ. The three of them then went back through the various open or smashed doors into the main store. Bartunek wanted to check out the toy section but did not after Hruby said that they had already done so. In the main store, they came upon the second TV set and Russ wanted to dust it for latent finger prints, but did not after Hruby said that he had moved it and that his prints were all over it. Good police procedure would have been to have left it where it was until dusted for latent prints and photographed.

About this time, Chiapetta went out and backed his squad car up some 100 yards to the dock area but did not ask permission of either Russ or Bartunek before doing so. Just then Officers Honsik and Estes, who also had been advised of the break-in by the radio operator, drove up in their squadrol and they and Chiapetta transferred the TV and the tape player into the squadrol. Honsik and Estes say in their written reports that, in addition to the TV and the tape player, three boxes were also put into their squadrol but Chiapetta denies this. Chiapetta then told them to "Get rid of the stuff" and that he would advise them in more detail later. Chiapetta then drove his empty squad car back to the store and Honsik and Estes left the scene in their squadrol headed east on Cermak. They testified that they worried about the fact that they could not function as an emergency car with all that stuff in the back seat and therefore drove to Honsik's private garage at 1640 South Scoville Avenue, where they unloaded the TV, the tape player and the three·

boxes and drove off, after locking the garage door. After a short time, they changed their minds and returned to the garage, loaded the TV, tape player and three boxes back into their squadrol and started for the station and had nearly reached it when they got an order, through the radio operator, to return the merchandise to the Sears store, which they then did.

Meanwhile, back at the store, Russ, using a public pay telephone, had contacted the station and told the operator to have Mr. Sachar, who represented the Sears store in such an emergency and lived near the store at 2121 South Maple Avenue, come to the store, which he did. At about this point, Russ told Bartunek that he had seen Chiapetta placing three boxes next to his squad car and had later seen him backing the car from the scene with the boxes on the seat. Bartunek called Chiapetta and Hruby over and told them to "Bring back whatever you're taking from the store." Chiapetta answered that it had already left the scene in the squadrol. Bartunek said that that was not right and to "get it back to the store right away." Hruby's testimony was that he did not know that any merchandise had been removed until Chiapetta told him of it, just before the confrontation with Russ and Bartunek above related.

Detective Russ and Sergeant Bartunek testified that, just after Bartunek told Chiapetta and Hruby to get the stuff back to the store, they saw Hruby leave the scene in the squad car at 40 to 50 miles an hour, headed east on Cermak and that he was gone for about 10 minutes. Hruby flatly denies this and says that he did not leave the scene and that he could not have driven the squad car because Chiapetta had the only ignition key in his belt.

In any event, Hruby and Estes carried the TV back into the Sears store and Chiapetta returned the TV and tape player. Detective Russ and Sergeant Bartunek testified that they then both asked Chiapetta and Hruby where the three boxes were and that Hruby said that "They're just toys and Sears won't miss them." Hruby denies making any such statement. The boxes were not seen again.

After a complete check of the premises, the store was locked up and the officers returned to the station at about 6 A.M. Sergeant Bartunek told Sergeant Hanzl, the watch commander, that there had been an "attempted break-in, no loss." At that time, Sergeant Hanzl did not know that any property had been taken from Sears to a private garage and later returned to Sears and Sergeant Bartunek did not so advise him at that time. At about 9 A.M., Police Chief Herold called Hruby's wife and she told him the chief wanted him to come to the station immediately which he did. The chief asked him if anything happened last night and Hruby said no. The chief then said that he had received a call

from some woman who said "if you want to catch some thieves, look at your own police department." He then asked Hruby, "Was any merchandise taken from Sears?" Hruby said "No." The chief replied "Okay. If anything further comes up, we'll notify you." Chiapetta also had a similar experience except that he was more loquacious and gave his resume of the incident. He also testified that Chief Herold threatened him with criminal charges, and said "If you'll resign, we'll let everyone else go." The chief and others present deny this.

The officers involved all made written reports. Honsik's reflected the facts that Chiapetta had given him and Estes a TV, a tape player and three boxes and told him to get rid of them, that he and Estes took said merchandise to Honsik's own garage and unloaded it there but later returned and reloaded it into the squadrol and were headed for the station when the radio operator told them to return to the shopping center which they did.

On about November 5, 1969, the Chicago Sun Times newspaper had a big write-up "Burglary Ring in Berwyn" and all of the officers were again called into the chief's office. A rather uproarious confrontation then and there occurred, and the testimony as to what actually was said is in considerable conflict. According to the chief, Chiapetta said that he was sorry for what had transpired, that the whole incident was of his doing and that he was willing to resign if charges would not be pressed against the other officers. Other officers present corroborate this version, but Chiapetta denies making any such statement. Chiapetta and Hruby, on the contrary, testified that they were asked to resign and were threatened with criminal charges if they did not and that the chief said that "If you resign, we'll let everyone else go." The chief denied making such statements or threats.

On November 7, 1969, Chiapetta and Hruby were suspended from duty; criminal charges were filed against them; and they were tried in the criminal court where a verdict of "Not Guilty" was directed at the end of the State's case. All four officers subsequently were tried before the three-man Board of Fire and Police Commissioners, which, after hearing some 16 witnesses, found them guilty and discharged them.

## I.

This brings us to the plaintiffs' first contention—that the Board's findings and decision are not supported by and are contrary to the manifest weight of the evidence; and that the court below erred in affirming said decision.

Insofar as Chiapetta is concerned, his story about the kissing couple as an explanation for not answering radio calls; his leaving his squad

car unattended (without advising the radio operator) while he and Hruby checked a break-in; his moving a TV and a tape player from the lean-to to his squad car to get them out of the way and out of the rain when his handwritten statement puts them inside the lean-to which not only had an overhang but was some 5 feet deep toward the first broken glass doors; his further action in removing three boxes, apparently toys (which he denies but many others say was so) which were never returned to Sears; his orders to Honsik and Estes to "get rid of the stuff"; his failure to tell Russ or Bartunek of the stuff in the squad car and squadrol until asked by them as to its whereabouts; and his statements after the publicity about "police burglars" to the effect that the whole incident was of his doing and that he would resign if the others were let go (corroborated by many, although denied by him) seem to us to support the Board's findings that he was guilty of improperly removing a color TV, a tape player and some toys from the Sears store during said investigation and thus guilty of engaging in conduct unbecoming a police officer. The Board's decision most certainly is not contrary to the manifest weight of the evidence.

Insofar as Hruby is concerned, much of the foregoing, which applies equally to him as well as to Chiapetta; plus the testimony (which he denies) that after Sergeant Bartunek ordered the merchandise returned to the Sears store, he left the scene at high speed in the squad car and was gone for 10 minutes just before the return of the property; plus testimony that he handled and moved the second TV in the main store before it was fingerprinted or photographed; plus testimony (which he denies) that when asked about the failure to return the three boxes, he replied that "They're just toys, and Sears will never miss them," appears to us to support the Board's findings and decision discharging him and they are most certainly not contrary to the manifest weight of the evidence.

We recognize that Chiapetta's and Hruby's versions of many of the key factual issues conflict with the Board's findings, but, as was said by the trial court:

> "The police officers may argue that they provided plausible explanations for their individual actions. The answer is that the Board was not required to accept them."

■■■ This is so because, where there is conflicting testimony, the agency conducting the hearing determines the credibility of the various witnesses (*Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill.App.3d 864, 868, 278 N.E.2d 212; *Davis v. Board of Fire & Police Commissioners* (1962), 37 Ill.App.2d 158, 185 N.E.2d 281), and so long as the findings of the agency are based on substantial evidence and they

do not go against the manifest weight of the evidence, the courts will not substitute their own independent judgment. (*Rauland Division, Zenith Radio Corp. v. Metropolitan Sanitary District* (1973), 9 Ill.App. 3d 864, 874, 293 N.E.2d 432; *Avent v. Police Board* (1964), 49 Ill.App.2d 228, 199 N.E.2d 637; *Etscheid v. Police Board* (1964), 47 Ill.App.2d 124, 197 N.E.2d 484.) As we noted previously, the fact findings of the Board are here supported by the evidence.

We are also of the opinion that facts established that such actions constituted "conduct unbecoming a police officer" in violation of chapter 1, rule 2 of the rules and regulations of the department and fully justified their discharge.

The standard "conduct unbecoming a police officer" is an elastic term subject to a wide variety of differing interpretations depending on the individual conceptions of how policemen should conduct themselves. (*Gaudette v. Board of Public Safety* (1956), 20 Conn. Supp. 147, 127 A. 2d 836.) However, these individual conceptions of misconduct must be rooted in substantial shortcomings (*Coursey v. Board of Fire & Police Commissioners* (1967), 90 Ill.App.2d 31, 37, 234 N.E.2d 339) thereby excluding any individual's conception of misconduct which is so trivial as to be unreasonable and arbitrary. *Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill.App.3d 864, 869, 278 N.E.2d 212.

■■ The legislature therefore has prescribed that no police officer may be discharged without cause (Ill. Rev. Stat. 1969, ch. 24, par. 10—2.1—17), and while "cause" is nowhere defined by statute, the courts have construed it to mean, "some substantial shortcoming which renders the employees continuance in office some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognizes as good cause for his no longer holding the position." *Murphy v. Houston* (1928), 250 Ill.App. 385; cited with approval in *Coursey v. Board of Fire and Police Commissioners, supra.*

■■ In *Davenport* the court affirmed the Board's dismissal of the appellant police officer for conduct unbecoming a police officer where the Board found that, while armed and off duty, he attacked the complainant without provocation. The court determined that such conduct was detrimental to the discipline and efficiency of a metropolitan police department and that therefore the Board had sufficient cause to discharge him. In the instant case the evidence establishes that the plaintiffs wrongfully removed merchandise from the Sears store in a manner strongly indicative of the commission of a theft, and we are forced to conclude, as did the court below, that the Board properly discharged them. Their conduct amounted to a substantial shortcoming which con-

454

stituted cause for dismissal and we fully concur in the trial court's conclusion that:

"Such a course of conduct would constitute conduct unbecoming an officer and because the prosecution called it that rather than theft or conspiracy should not redound to their benefit."

Affirmed.

GOLDBERG and BURKE, JJ., concur.