GEORGE C. LEGG, Plaintiff-Appellant, *v.* ILLINOIS FAIR EMPLOYMENT PRACTICES COMMISSION *et al.,* Defendants-Appellees.

(No. 61051;

First District (5th Division)—May 9, 1975.

*Rehearing denied June 16, 1975.*

Hardman, Burke, Kerwin & Towle, of Chicago (James C. Hardman and Joseph Winter, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Patricia Rosen, of counsel), for appellee Illinois Fair Employment Practices Commission.

Michael J. Murray, of Chicago (Richard E. Girard and Stanley A. Strzelecki, Jr., of counsel), for appellee Board of Education.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

This is a suit to review proceedings before the Illinois Fair Employment Practices Commission (Commission) stemming from a charge of discrimination on account of race[1] filed with the Commission by plaintiff

---

[1] The charges are predicated on a violation of Section 3 of the Fair Employment Practices Act (Ill. Rev. Stat. 1973, ch. 48, par. 853), which provides:

"It is an unfair employment practice:

(a) For any employer, because of the race, color, religion, sex, national origin or ancestry of an individual to refuse to hire, to segregate, or otherwise to discriminate against such individual with respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment; * * *."

against defendant Chicago Board of Education (hereafter Board.) Following a hearing on stipulated facts, the Commission dismissed the complaint. In a proceeding pursuant to section 264 *et seq.* of the Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, par. 264 *et seq.*) to review the Commission's action, the circuit court affirmed that dismissal from which order this appeal is taken.

Complainant contends that (1) the Commission exceeded its statutory authority in that, having found the School Board violated the Illinois Fair Employment Practices Act (FEPA), it excused said conduct on the basis of Federal law; (2) the Commission erred in finding that Federal law required the sanctioning of an unfair employment practice; and (3) that attorney's fees should have been awarded to complainant. The facts, as stipulated, are as follows:

On May 7, 1970, plaintiff applied for a position as a teacher with the Board. The employment of teachers in the City of Chicago is provided for under the Otis Law sections of the Illinois School Code. (Ill. Rev. Stat. 1973, ch. 122, pars. 34—83.) That law provides for teacher examinations by a Board of Examiners, certification, and permanent appointment by the Board as regularly certified teachers with tenure. The Board also employs temporary substitute teachers as either (1) full-time basis substitute teachers (FTB's) who are willing to work on a full-time basis; and (2) day-to-day substitutes. With regard to the hiring of teachers, the School Code (Ill. Rev. Stat. 1973, ch. 122, par. 24—4) provides:

> "The color, race, nationality, religion or religious affiliation of any applicant seeking employment either as a superintendent, principal, teacher or otherwise in the public elementary or high schools, shall not be considered either a qualification or disqualification for any such employment. Nor shall color, race, nationality, religion or religious affiliation be considered in assigning any person to an office or position or to any school in the school system."

Violation of the act is made a misdemeanor.

Here, the plaintiff had been issued a temporary teaching certificate by the Board of Examiners on May 7, 1970, and then applied for an FTB position. Because it was close to the end of the school year, the only position then available was as an FTB at the Prussing School, which had an all white faculty. He was assigned there effective May 8 to fill a new vacancy under his temporary certificate. Later that day another FTB position became available beginning May 18 at the Arnold Upper Grade Center, a school with an integrated faculty within the citywide average of 66% white, 34% black.

Plaintiff was then informed by the Board that, in compliance with demands and proposals of the United States Departments of Justice and of

Health, Education and Welfare (HEW), a program had been undertaken to (1) equalize the distribution of qualified teachers in the Chicago public school system; and (2) end the de facto segregation of teachers by race in the system; and, because he was white and the faculty of the Prussing School was all white, his assignment to that school was withdrawn and he was reassigned under the same temporary teaching certificate to an equal-paying FTB position (Grade 7-8, Language-Arts) at the Arnold Upper Grade Center, effective May 18. After being so informed, plaintiff accepted said assignment change and completed the application forms therefor. Out of the 6 school days between May 8 and May 18, he worked 2 days and was paid $40 per day as a day-to-day substitute.

On May 18, he reported as an FTB teacher to the Arnold School. However, the principal there, in accordance with her authority under Board rules, assigned him to a vacancy in a special education class instead of an upper-grade position for which there was then no vacancy at that school. He informed the principal that special education was beyond the scope of his training but that he would attempt to fill the position. He worked and was paid for May 18 and 19, when he told the principal he was unable to handle the class properly and requested a transfer. The principal informed him his only alternative was to resign and apply for day-to-day substitute work (which he did on May 20), and thereafter he worked as a day-to-day substitute. Out of the 26 school days of possible employment for day-to-day substitutes between May 20 and the close of the school term on June 26, 1970, he worked and was paid for 16 days and refused employment on 3 days. On July 24, 1970, he applied for and accepted assignment again as an FTB teacher, beginning with the new school term on September 7, 1970, at the Mason Upper Grade Center, where he is still employed.

For many years prior to the 1969 Justice Department demand, original appointments of regularly certificated teachers have been made by the Board under the Otis Law from the eligibility lists of the Board of Examiners in the order of merit, and to vacancies in the schools as they occurred. In addition, temporary assignments of teachers certified as temporary substitutes were based upon individual need for teachers, pending filling of vacancies with regular teachers. Likewise, transfers of teachers were made on the basis of application date on transfer books rigidly maintained and open for public inspection. The factors taken into consideration by the Board in the assignment of a teacher to a particular school were (1) nature of vacancy; (2) examination and certification; (3) teacher's educational background and special qualifications; (4) teacher's experience; (5) special interests; and (6) distance of travel.

The Board maintained no record of the race of any teacher and race was not a factor in teacher assignment.

In approximately 1958, because of a teacher shortage, a new procedure had been added by the Board for original appointments and assignments. A city map was established in the personnel department showing the location of schools where teacher vacancies existed, and teachers were permitted to indicate schools preferable to them because of proximity to home, etc. At that time, the FTB category of teachers was first established. Later, in 1964, the Board modified its transfer procedure by providing that no regularly appointed teachers would be transferred to a school where 95% or more of the teaching positions were filled by regularly appointed teachers. Also, on February 13, 1964, it adopted a "Statement of Policy of Racial Integration" as follows:

> "The members of the Chicago Board of Education believe that this city and this country would be healthier economically, educationally, and morally if Chicago, Illinois, and all sections of the country, reflected the kind of racial and ethnic diversity characteristic of the nation as a whole * * *. Therefore, we reaffirm and publicly declare a policy of racial integration. We shall endeavor to effect the development of a continuous program to achieve this goal."

On August 23, 1967, the Board published a report "Increasing Desegregation of Faculties, Students, and Vocational Education Programs," which was the result of a planning grant from the United States Office of Education. The report found that for the most part black teachers were teaching in schools located in black neighborhoods and white teachers in schools in white neighborhoods; teachers in schools in the black and the low socioeconomic neighborhoods were younger, less experienced, less qualified and subject to higher turnover than teachers in schools in predominantly white, more favored socioeconomic areas; the pattern of segregation and staff imbalance was the result of long enduring social and economic realities and resulting preferences and attitudes of teachers permitted by administrative policies and practices. The report recommended, among other things, that the Board personnel department and department of integration and human relations continue to cooperate in their program of encouraging integration in teacher assignments, and teachers were "reminded of the importance of the education of all children that they have some contact and acquaintance with persons of ethnic backgrounds other than their own in preparation for their successful adjustment in the multi-racial multi-cultural world in which they will live as adults."

In 1968, pursuant to agreement with the Chicago Teachers Union, the Board again modified its teacher assignment procedure so that no regularly appointed teachers would be transferred to a school where 90% (formerly 95%) or more positions were filled by regular teachers, thereby requiring each city school to have at least 10% of its faculty consist of temporary teachers. Thereafter, in 1968 and 1969, the Board continued its efforts to reduce the separation of races existing in its teaching personnel. No records were made as to the race of individual teachers, but visual observation surveys of the teaching staff indicated that approximately 66% of the staff was white and 34% black.

On July 9, 1969, the United States Department of Justice notified the Board that its practices with respect to the assignment and transfer of faculty and staff members had the effect of denying black students in the Chicago public schools the equal protection of the laws in violation of Title IV of the Civil Rights Act of 1964 and the fourteenth amendment to the United States Constitution. The Department of Justice further stated that, according to information available to it, "215 of Chicago's 578 elementary, junior high and senior high school schools have totally all-white or all-Negro faculties * * * that 93% of the Negro elementary and junior high school teachers are assigned to schools with Negro enrollments between 90-100% and only 3% of the Negro elementary and junior high school teachers are assigned to schools having 50% or more white enrollments * * * that there are 16 high schools which have all-white faculties and one high school with a faculty that is 91% Negro." The Department demanded that the Board undertake a "comprehensive program to disestablish the segregated pattern of faculty assignments, and to equalize the distribution of certificated and experienced personnel and substitute teachers" by a program (1) modifying the present transfer policy; (2) assigning new teachers so as to correct the present assignment pattern; (3) encouraging voluntary transfers; and (4) if necessary, requiring mandatory transfers.

On July 23, 1969, the Board answered the Justice Department by (1) stating it had not engaged in de jure segregation in the assignment and transfer of teachers; (2) expressing its concern because of the Illinois School Code section 24—4 prohibition of consideration of color or race in assignments or transfers in the school system; (3) stating its concern with the guarantee of equal protection provided by the Fourteenth Amendment and Title IV of the 1964 Civil Rights Act; and (4) by offering to undertake a step-by-step program to modify the pattern of faculty assignments to reflect the citywide ratio of experienced and inexperienced teachers.

On October 20, 1969, the Department of Justice rejected the Board's proposal and directed it to request the assistance of HEW in formulating an educationally feasible faculty desegregation and equalization plan. On November 25, 1969, in compliance with this direction, the Board requested assistance from that Department. Thereafter, representatives of the Board and of HEW met and worked together to develop a faculty integration plan and program.

In May, 1970, in pursuance of said objectives, the Board modified its procedure by adding a new element; namely, the race of the teacher, to the factors then taken into consideration in assigning a teacher to a particular school. A program was then established in the Board personnel department to place teachers in schools where their assignment would enhance the racial representativeness of those schools. If the racial composition of the teaching staff of the school where a vacancy occurred was not within 10% of the current systemwide average (66% white; 34% black), then the factor of race was used along with the other factors in making the teacher appointment or assignment. If the school was within 10% of the systemwide average, the racial factor was not considered. As hereinabove more particularly set forth, the assignment of the complainant herein on May 8, 1970, was so made in pursuance of the faculty integration plans required by the Department of Justice and being developed in cooperation with HEW.

The Commission found that plaintiff was transferred because of his race but that the transfer was lawful in order to implement the Federal policy of desegregation.

OPINION

On appeal, the Commission contends first that it is unnecessary for this court to answer plaintiff's charges because the hearing examiner never found that a discriminatory practice had occurred; or, if his decision is so construed, such finding was error in that the action of the Board did not constitute a discriminatory practice. This latter issue concerns whether a transfer from one position and school assignment to another, assuming it to be solely on account of race, may be construed as a discriminatory practice "with respect to * * * conditions of employment" within the purview of section 853 of FEPA (Ill. Rev. Stat. 1973, ch. 48, par. 853.)

We believe it apparent that the hearing examiner found a violation of FEPA. In his recommended order and decision, he states:

> "The Board did withdraw the assignment of Mr. Legg to the Prussing School because he was white. The Fair Employment Practices Act does provide that it is an 'unfair employment practice' for

any employer to discriminate against an individual because of his race or color. Were this all there was to the case, the recommended order would have to find that an unfair employment practice took place."

Thus, it is necessary to determine the correctness of that decision; *i.e.*, whether the action complained of constitutes discrimination with respect to "conditions of employment" within the meaning of section 853 of FEPA, as plaintiff contends.

■■ As a general rule, administrative agencies, under their duty to make decisions and determinations, have authority to construe statutory provisions. (*Sugden v. Department of Public Welfare*, 20 Ill.2d 119, 169 N.E.2d 248.) The agency's determination of the law will be accorded great weight by the judiciary when that department of the government is called upon to construe the law and will, in general, control whenever the question is in a degree doubtful or open to reasonable rebate. *Nye v. Foreman*, 215 Ill. 285, 288, 74 N.E. 140.

■■ We believe the Commission could properly conclude that the transfer involved herein was a discriminatory practice with respect to conditions of employment. At the Prussing School, plaintiff was assigned to a position within the area of his training. His subsequent transfer resulted in his placement in a position for which he was unprepared and inexperienced. The record indicates that he was unable to properly handle the special education class to which he was assigned and for which he had no training. Although his salary and benefits were the same in either position, it appears to us that FEPA should be broadly construed so as to encompass this action within its prohibition of discrimination "with respect to * * * conditions of employment." Certainly the Commission so construed the Act, and that determination will be accorded great weight. Accordingly, we believe this decision of the hearing officer was correct.

Proceeding to the merits of the issue presented, there is here no dispute that, absent other factors, the Board had the power and the obligation to take steps to alleviate segregation among its faculty. As stated in *Porcelli v. Titus* (3rd Cir. 1970), 431 F.2d 1254, *cert. denied*, 402 U.S. 944, 29 L. Ed.2d 112, 91 S.Ct. 1612, involving a suit by 10 white teachers alleging discrimination by the Newark Board of Education:

"State action based partly on considerations of color, when color is not used per se, and in furtherance of a proper governmental objective, is not necessarily a violation of the Fourteenth Amendment. Proper integration of faculties is as important as proper integration of schools themselves, as set forth in Brown v. Board of Education,

349 U.S. 294, 295, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the thrust of which extends to the selection of faculties." 431 F.2d 1254, 1257.

Further, in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 28 L.Ed.2d 554, 91 S.Ct. 1267, the United States Supreme Court upheld the right of school boards to voluntarily adopt racial quotas in the exercise of that broad discretion which is vested in school authorities, declaring at page 16:

"School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy, is within the broad discretionary powers of school authorities * * *."

The rule in Illinois is fully in accord with the Federal cases. In *Tometz v. Board of Education,* 39 Ill.2d 593, 237 N.E.2d 498, the Supreme Court of Illinois upheld the constitutional validity of the Armstrong Amendment to the Illinois School Code relating to the duties of school boards. (Ill. Rev. Stat. 1967, ch. 122, par. 10—21.3.) That act compelled school boards to consider race in formulating school boundaries "in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality." In approving a Board plan for the elimination of de facto school segregation, the court states at pages 597-598:

"State laws or administrative policies, directed toward the reduction and eventual elimination of *de facto* segregation of children in the schools and racial imbalance, have been approved by every high State court which has considered the issue. [Citations omitted.] Similarly, the Federal courts which have considered the issue, * * * have recognized that voluntary programs of local school authorities designed to alleviate *de facto* segregation and racial imbalance in the schools are not constitutionally forbidden."

However, the court in *Tometz* acknowledged that:

"[T]he question as to whether the constitution requires a local school board, or a State, to act to undo *de facto* school segregation is simply not here concerned." 39 Ill.2d 593, 597.

So, here, plaintiff asserts that the issue presented is not whether, absent other factors, the Board may voluntarily adopt such procedures. Rather, he contends the issue is, absent a Federal court order or a finding of de jure discrimination and faced with an explicit State statute prohibiting discrimination, whether the Board may, on its own, confess the existence of de facto segregation among its faculty and take affirmative action to

relieve this condition in apparent violation of both the School Code and FEPA.

Thus, we believe the issue presented poses the question of whether the Federal law may be invoked to excuse an apparent violation of the concededly valid State laws. We think this depends upon whether the discrimination sought to be remedied should be classified as de.facto or de jure.

■■ Wherever de jure segregation existed following the effective date of *Brown I*,[2] an affirmative duty devolved upon all school boards "to convert to a unitary system in which racial discrimination would be eliminated root and branch." (*Green v. County School Board*, 391 U.S. 430, 438, 20 L.Ed.2d 716, 723, 88 S.Ct. 1689, 1694 (1968); *United States v. Board of School Commissioners* (7th Cir. 1973), 474 F.2d 81, *cert. denied*, 413 U.S. 920, 37 L.Ed.2d 1041, 93 S.Ct. 3066.) This duty is one mandated by the Constitution and, as such, is the supreme law of the land.

In *North Carolina State Board of Education v. Swann*, 402 U.S. 43, 28 L.Ed.2d 586, 91 S.Ct. 1284, the court addressed a problem arising out of the North Carolina legislature's attempts to impede desegregation of a de jure segregated school system. In response to a series of suits to compel desegregation of the school system, the legislature had passed a statute prohibiting discrimination in th assignment of students to schools. The three-judge trial court enjoined enforcement of the law. On direct appeal, the Supreme Court held, at pages 45 and 46:

> "[I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.
>
> The legislation before us flatly forbids assignment of any student on account of race or for the purpose of creating a racial balance or ratio in the schools. The prohibition is absolute, and it would inescapably operate to obstruct the remedies granted by the District Court in the *Swann* case. But more important the statute exploits an apparently neutral form to control school assignment plans by directing that they be 'color blind'; that requirement, against the background of segregation, would render illusory the promise of *Brown v. Board of Education*, 347 U.S. 483 (1954). Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be con-

---

[2] May 17, 1954, *Brown v. Board of Education*, 347 U.S. 483, 98 L.Ed. 873, 74 S.Ct. 686.

sidered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems.

Similarly, the flat prohibition against assignment of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems. As we have held in *Swann*, the Constitution does not compel any particular degree of racial balance or mixing, but when past and continuing constitutional violations are found, some ratios are likely to be useful starting points in shaping a remedy. An absolute prohibition against use of such a device—even as a starting point—contravenes the implicit command of *Green v. County School Board*, 391 U.S. 430 (1968), that all reasonable methods be available to formulate an effective remedy."

On the other hand, the Federal courts of this circuit have enunciated the rule that there is no constitutional duty to remedy the effects of racial imbalance or to maintain any particular racial balance in public schools so long as the imbalance is the result of de facto segregation unaided by any State action. (*United States v. Board of School Commissioners; Bell v. School City of Gary, Indiana* (7th Cir. 1963), 324 F.2d 209.) This leads us to conclude that, absent a constitutional duty to remedy de facto segregation, the Board lacks any higher authority to excuse its noncompliance with valid State laws and, accordingly, it is bound by such laws in its attempts to alleviate de facto segregation.

Here, however, the school board, in serving notice on plaintiff, declared as its reason for the discriminatory practice the elimination of de facto segregation among its faculty. Although this was the reason given, it appears from the record that the Board's action was in response to the Justice Department's and HEW's finding that de jure segregation of faculty existed. Indeed, we note that the Board's policy of faculty assignments and transfers mirrors the policy found to be de jure discriminatory in *Morgan v. Hennigan* (D. Mass. 1974), 379 F.Supp. 410, 456-61. Furthermore, the United States Supreme Court, in analyzing the analagous Federal statute, Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e to 2000e—15), stated in *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 28 L.Ed.2d 158, 91 S.Ct. 849, that the thrust of the act is directed at the consequences of employment practices and not simply the motivation. It has also been stated, with regard to the Federal Act, that the intent of the employer is not a relevant consideration. *Watkins v. United Steel Workers of America* (E.D. La. 1974), 369 F.Supp. 1221.

We feel the intent and purpose of the Illinois act is similar to that of

the Federal acts and, as a consequence, we need not be limited or bound in our decision by the reasons stated by the Board. Rather, we find that the facts offer sufficient basis to believe de jure discrimination existed as contended by the HEW and Justice Departments and that the hearing officer was correct when he answered this some objection by stating:

> "It is true that the correspondence of the Board of Education does not contain an admission by it that it has been conducting an unconstitutional faculty transfer policy. The Stipulation of Facts did, however, contain references to an inordinate number of Chicago schools that had segregated faculties and courts have held that this established an inference that the system is unconstitutional."

We believe the Board could properly act on that inference.

Nor do we believe, as contended by Legg, that the Commission's holding need await a judicial finding of the existence of a policy of de jure segregation before the Board could initiate programs. Although, as a general rule, affirmative-action programs are court imposed and therefore cite as their authority the equitable powers of the court to undo the results of past discrimination as well as prevent future inequality (*e.g., Louisiana v. United States,* 380 U.S. 145, 154, 13 L.Ed.2d 709, 85 S.Ct. 817 (1964); *Carter v. Gallagher* (8th Cir. 1971), 452 F.2d 315, 329, *cert. denied,* 406 U.S. 950, 32 L.Ed.2d 338, 92 S.Ct. 2045; *United States v. Mississippi* (5th Cir. 1964), 339 F.2d 679; *United States v. Duke* (5th Cir. 1964), 332 F.2d 759), these actions are in turn based upon the fact that the United States Supreme Court's determination that discrimination in public education is unconstitutional is the supreme law of the land. U.S. Const. art. VI, sec. 2; *Kelley v. Board of Education* (6th Cir. 1959), 270 F.2d 209; *United States v. School District 151 of Cook County, Ill.* (N.D. Ill. 1969), 301 F.Supp. 201, *aff'd* (7th Cir. 1970), 432 F.2d 1147.

■■ In view thereof, it appears that the Commission could and did properly interpret the mandate of the United States Supreme Court in *Brown, Green* and *Swann* as they relate to the functions of the Fair Employment Practices Commission. As stated in *Sugden v. Department of Public Welfare,* 20 Ill.2d 119, 121, 169 N.E.2d 248:

> "If an administrative agency had to have every questioned meaning of a court's decision interpreted by a court before it could proceed, it would be deprived of the advantages of prompt and definitive action. We are of the opinion that an administrative agency has the authority to construe a court's decision to the extent that it is necessary for the initial determination of the issues which the legislature has given it the authority to determine."

■■ De jure discrimination is illegal ipso facto and steps to alleviate its effects may suspend valid State laws. (*Louisiana v. United States; Carter*

*v. Gallagher; United States v. Mississippi; United States v. Duke.*) Although the Board only admitted the existence of de facto segregation, we believe the Commission could properly accept the finding of the Department of Justice and HEW, after an examination of legal precedents, that the Board's policy was de jure discriminatory in its effect and that affirmative action was therefore required to correct it, thereby suspending the State laws.

A further problem lies in the question of whether the Commission has the power to make the preliminary finding of de jure discrimination necessary here to excuse the Board's noncompliance with the FEPA. The opinion of the hearing examiner, adopted by the Commission, states:

> "The Stipulation of Facts in this case spells out that it is the opinion of the Department of Justice that in its assignment of teachers the Board of Education was operating an unconstitutionally segregated public school. It necessarily follows that a duty arises on the part of the Board to take steps to eliminate or disestablish such segregation."

While we may disagree with the statement that the opinion of the Justice Department of the existence of an unconstitutionally segregated public school system necessarily gives rise to an obligation to correct that situation, we believe the facts presented to the Commission support the Justice Department's opinion. It seems to us that this statement of the Examiner as to the duty of the Board and his prior statement that the inordinate number of Chicago schools with segregated faculties raised an inference that the system is unconstitutional, together indicate that the Commission adopted the Justice Department's finding that a policy of de jure discrimination existed based on the record presented. This conclusion is further supported by the following language of the Examiner's opinion:

> "[T]he only way to turn about a structure *created by discrimination and segregation based on race,* is to take cognizance of race and require programs to affirmatively rebalance the distribution."
> (Emphasis added.)

■■ Nor does it appear that such a finding is outside the power of the Commission. Section 6.07 of FEPA (Ill. Rev. Stat. 1973, ch. 48, par. 856.07) gives the Commission the power to "receive, investigate and determine charges filed by complainants with it in conformity with this Act." The finding of an inference of de jure discrimination is necessarily incident to the determination of such charges and thus, it seems to us, is within the scope of the Commission's authority.

■■ Finally, plaintiff contends costs and reasonable attorney's fees should be granted. Generally, costs in civil cases follow the result of the action

or proceeding. (14 I.L.P. *Costs* § 5 (1968).) Further, FEPA is silent as to the recovery of fees, and it can be assumed that the general rule against the recovery of such fees applies here to civil rights cases just as it does in any other but the exceptional case. *Batiste v. Furnco Construction Corp.* (N.D. Ill. 1972), 350 F.Supp. 10, 15.

In view of our disposition of this case and the absence of any statutory right to attorney's fees, we believe such an award would be improper.

For the reasons stated above, the decision of the trial court is affirmed.

Affirmed.

BARRETT, P. J., and LORENZ, J., concur.