WILLIAM E. RANQUIST, Plaintiff-Appellee, *v.* RONALD E. STACKLER, Director of the Department of Registration and Education, *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 76-1175

Opinion filed December 7, 1977.

William J. Scott, Attorney General, of Chicago (Gregory G. Lawton, Assistant Attorney General, of counsel), for appellants.

Coffield, Ungaretti, Harris & Slavin, of Chicago (Philip C. Stahl, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

By this appeal, the Department of Registration and Education (the Department) and its Director, Ronald E. Stackler, the defendants below, seek to reinstate the Director's order which suspended the real estate salesman license of the plaintiff, William E. Ranquist. The order, issued after a full administrative hearing, concludes that Ranquist violated the conduct required of him by the Real Estate Brokers and Salesmen License Act (Ill. Rev. Stat. 1973, ch. 114½, par. 115(e)), on September 4, 1974, by inducing persons to purchase property through statements which misrepresented and distorted the racial composition and the quality of certain neighborhoods in Chicago. In this action by Ranquist, pursuant to the Illinois Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, par. 264 *et seq.*), the circuit court reversed the suspension order. The court found that this conduct was not prohibited by the Act in effect at the time the statements and misrepresentations were made.

The Department filed a complaint with the Real Estate Examining

Committee (the Examining Committee) requesting the revocation or suspension of Ranquist's real estate salesman's license. Ranquist is an employee of the real estate brokerage of McKey and Poague.[1] The complaint, after describing certain of Ranquist's actions on September 4, 1974, set forth six subsections of section 115(e) of the Real Estate Brokers and Salesmen License Act as causes to suspend or revoke his license:

"11. Having demonstrated unworthiness or incompetency to act as a real estate broker or salesman in such manner as to safeguard the interest of the public;

\* \* \*

15. Any other conduct, whether of the same or a different character from that specified in this Section which constitutes dishonest dealing;

\* \* \*

21. Disregarding or violating any provision of this Act, or the published rules or regulations promulgated by the Department to enforce this Act;

\* \* \*

26. Making any misrepresentations concerning the race, color, religion or national origin of persons in a locality or any part thereof for the purpose of inducing or discouraging a listing for sale or rental or the sale or rental of any real estate.

\* \* \*

28. Refusing to show listings or real estate because of the race, color, religion or national origin of any prospective purchaser, lessee or tenant, or because of the race, color, religion or national origin of the residents in the area in which the property is located.

\* \* \*

31. Volunteering of information on the race, color, religion or national origin of the residents of a community or part thereof."

Subsequently, subsections 26, 28 and 31 were stricken upon Ranquist's motion. Those subsections were amendments to section 115(e) of the Act which became effective September 5, 1974, the day after the conduct alleged in the complaint occurred. The Department's complaint remained based on subsections 11, 15 and 21.

At the hearing before the Examining Committee, the Department presented Ronald Pudel as its sole witness. Pudel, a caucasian resident of the Morgan Park community of Chicago, testified it was his observation that McKey and Poague showed homes for sale in his neighborhood exclusively to one race. He thought that their salesmen might be unfairly

---

[1] The brokerage of McKey and Poague was served with a similar complaint. After a hearing, the Examining Committee found that the Department failed to prove its case against the brokerage.

influencing prospective purchasers by discouraging buyers from considering homes in certain areas on a racial basis. This practice is commonly called racial steering. (See *Zuch v. Hussey* (E.D. Mich. 1973), 366 F. Supp. 553.) He felt that such sales tactics damaged his neighborhood. In an effort to confirm his suspicions Pudel and his wife went to the offices of McKey and Poague on September 4, 1974. Representing themselves as a couple from Cleveland, Ohio, interested in purchasing property, they asked Ranquist to help them locate a suitable residence in Morgan Park or Beverly, an adjoining community. During this meeting the Pudels and Ranquist examined a listing of homes for sale. From this listing a number of homes were selected and their addresses written down. Ranquist reviewed these addresses and scratched out several, remarking to Pudel that homes in that particular neighborhood were "low priced," and "going FHA to blacks." He advised the Pudels, "to stay north of 115th Street and west of Longwood Drive." Pudel requested to see a specific home; Ranquist replied that the home was one block from Morgan Park High School, which "is 90 percent black;" Ranquist said, "if you want to live that way it's all right with me."

Ranquist, testifying in his own behalf, denied making any of these statements. He claimed that he did not attempt to limit the area of the Pudels' consideration, comment on the population of Morgan Park High School or express any opinion about the quality of the community surrounding it. He admitted he crossed out the addresses, but he said he did not eliminate any of them for reasons related to race and location. Some of the homes were unlike the style of house in which the Pudels had represented interest; another was the subject of a signed sales contract and it violated office policy to show such a home to another buyer. Ranquist declared he was without authority to show the Pudels yet another listed home because the sales agreement between the brokerage and the owner of that home had expired.

The Examining Committee, after the hearing, made the following factual findings:

"13) THAT on or about September 4, 1974, Mr. & Mrs. Roland Pudil [the correct spelling is "Pudel"] went to Respondent Broker's office located at 10540 South Western Avenue, Chicago, Illinois and represented to Mr. Ranquist that they were prospective purchasers and were interested in purchasing a home in the Beverly or Morgan Park area of Chicago.

14) THAT Mr. Ranquist advised Mr. and Mrs. Pudil [*sic*] while they were reviewing various real estate listings in these areas, "not to look East of Longwood Drive . . . because these are low priced homes going FHA to Blacks."

15) THAT upon finding a home on Prospect Avenue, Mr. Ranquist

stated to the Pudils [*sic*] that "that house is one block from Morgan Park High School, which is 90% black."

By this conduct, they concluded, Ranquist violated subsections 11, 15 and 21 of section 115(e), for which they recommended the Director of the Department suspend Ranquist's real estate license for 60 days.

Ranquist requested a rehearing from the Director. At oral argument on this motion, Ranquist claimed that the recommendation of the Examining Committee was against the manifest weight of the evidence. He argued that the Department failed to show any evidence which would support a finding of unworthy or incompetent conduct (subsection 11), dishonest dealing (subsection 15) or conduct in violation or disregard of the licensing Act or rules and regulations promulgated by the Director (subsection 21). The Director denied the motion and adopted the findings of fact and the conclusions of law of the Examining Committee; he ordered Ranquist's license suspended for 60 days. Ranquist initiated this action to review the Director's determination in the circuit court. In his complaint he alleged:

"(a) The conduct complained of is not cause for suspension under the applicable statute, and the Department therefore exceed its authority;

(b) The decision was against the manifest weight of the evidence;

(c) The decision is contrary to law and based upon incorrect legal standards."

The circuit court reviewed the record and reversed the order of suspension, holding as a matter of law that the conduct in the Department's complaint was outside the scope of the License Act, section 115(e), subsections 11, 15 and 21.

The defendants argue that the question of whether subsections 11, 15 and 21 of section 115(e) of the Act can be construed to include racially discriminatory conduct was not properly before the circuit court. They contend that the circuit court, as a reviewing body, erred in considering that issue because the plaintiff failed to first present the theory of statutory construction as a specific claim at the administrative level. To first advance such an argument on review, the defendants contend, deprives the body charged with administering the License Act opportunity to initially construe the law it has the duty to enforce; therefore, Ranquist waived this argument.

■■ As a general rule, when a party presents his case or defense to an administrative body upon a certain theory, he will not be permitted to prevail upon another theory before the reviewing court. (*Abbott Publishing Co. v. Annunzio* (1953), 414 Ill. 559, 112 N.E.2d 101.) The reason for this rule, in addition to the purpose suggested by the defendant, is to avoid unfair surprise to an opponent thereby denying him

the chance to contest the issue. *Abbott Publishing Co.; Gordon v. Department of Registration & Education* (1970), 130 Ill. App. 2d 435, 264 N.E.2d 792.

■■ The rule is not applicable here. Examination of Ranquist's position during the administrative proceedings demonstrates that he did in fact challenge the Department's construction of the Act in relation to the charges placed against him. In his motion for rehearing, for example, his proposal that the Examining Committee's decision was against the manifest weight of the evidence is a twofold argument. First, Ranquist characterizes Pudel's testimony, the Department's evidence, as weak and incredible when compared to his own credible explanations of the occurrence. Second, he argues that no evidence produced at the hearing, in any event, shows conduct which could be cause for suspension of his license under the applicable provisions of section 115(e). While this latter proposition lacks the specificity of the issue framed before the circuit court, its thrust presented for the consideration of the Director the question of whether Ranquist's conduct violated subsections 11, 15 and 21 of section 115(e) of the Act. In accepting the facts and conclusions of law of the Examining Committee, the Director necessarily considered the question. His order of suspension subsumes that such conduct demonstrates unworthy or incompetent acts on the part of a licensed salesman (subsection 11), dishonest dealing (subsection 15) and a disregard of the provisions of the Act (subsection 21). The Director did consider the question of construction of the statute; he decided the question adverse to Ranquist. We find the issue was presented to the agency, preserved for review and not waived by Ranquist.

■■ Whether Ranquist's conduct can be a violation of section 115(e), subsections 11, 15 and 21 is a question of law. Generally, in construing a statute, a review court need not defer to the conclusion of the finder of fact. (*People v. Baldi* (1972), 3 Ill. App. 3d 496, 279 N.E.2d 21; *Schoenbein v. Board of Trustees* (1965), 65 Ill. App. 2d 379, 212 N.E.2d 380.) However, when an agency is the finder of fact as well as the interpreter of the law below, a review court is in a less than plenary position. While a court is not formally bound by the administrative decision as to legal effect of statutory words, it should give that conclusion great weight, using it as a substantial factor in its own construction of the statute. (*First National Bank & Trust Co. v. City of Rockford* (1977), 47 Ill. App. 3d 131, 361 N.E.2d 832; *Youakim v. Miller* (1976), 425 U.S. 231, 47 L. Ed. 2d 701, 96 S. Ct. 1399.) The importance of the agency's interpretation derives from the legislative decision to remedy harms through an administrative body. In using this method the legislature acknowledges the existence of complex problems requiring a variety of solutions and the need for an efficiency and expertise unavailable from specific, static laws.

The agency's expert appraisal of a situation is a necessary component of the law itself. The Illinois Supreme Court in *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 369 N.E.2d 875, noted:

> "* * *, the administrator's task is not merely to interpolate among broadly stated legislative prohibitions, but, rather, to extrapolate from the broad language of his enabling statute, and, using the regulatory tools given him by the legislature, to deal with the problems which the legislature sought to address."

In ascertaining legislative intent to construe a broad statutory standard delegated to an agency's discretion, a court must consider the particular agency's interpretation of that law (*Adams v. Jewel Companies, Inc.* (1976), 63 Ill. 2d 336, 348 N.E.2d 161) and should rely on the agency's interpretation as controlling whenever there is a question about it that is open to reasonable debate. *Legg v. Illinois Fair Employment Practices Com.* (1975), 28 Ill. App. 3d 932, 329 N.E.2d 486.

■■■   In defining a term of a statute, a court must assess the term in light of the statute's purpose: the mischief it attempts to prevent, the goals it seeks to attain. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.) The predominant purpose of the State in licensing a trade or profession is the prevention of injury to the public by assuring that the occupation will be practiced with honesty and integrity, excluding from the profession those who are incompetent or unworthy. (*People ex rel. State Board of Health v. Apfelbaum* (1911), 251 Ill. 18, 95 N.E. 995; *Kaplan v. Department of Registration and Education* (1977), 46 Ill. App. 3d 968, 361 N.E.2d 626.) In licensing real estate salesmen, that concern is evidenced in section 101 of the Act, which declares:

> "The intent of the legislature in enacting this statute is to evaluate the competency of persons engaged in the real estate business *for the protection of the public.*" (Emphasis added.) (Ill. Rev. Stat. 1973, ch. 114½, par. 101.)

The essence of the Act is remedial and it is settled law that a statute which is intended to promote the public welfare will be liberally construed. (*May v. Pollution Control Board* (1976), 35 Ill. App. 3d 930, 342 N.E.2d 784.) The focus of the Act is upon evaluation of a licensee's conduct with regard to fitness to practice the profession as it affects the public. Although a license suspension may be a hardship, resulting in the loss of livelihood, the action is not a criminal prosecution. A suspension is neither a judgment of the illegality of prior acts nor the infliction of a punishment for them. (*In re Damisch* (1967), 38 Ill. 2d 195, 230 N.E.2d 254; *Klafter v. State Board of Examiners of Architects* (1913), 259 Ill. 15, 102 N.E. 193; *Saleson v. Department of Registration and Education* (1968), 95 Ill. App. 2d 104, 237 N.E.2d 822.) The Real Estate Brokers and Salesmen License Act is not a penal measure, to be strictly construed against the State, but a

broad statutory system, interpretation of which must regard the State's interest in protecting the public from the effects of improper conduct by real estate salesmen.

With these tenets of construction in mind we look at the wording of section 115(e) to determine if Ranquist's conduct falls within its prohibitions.

No Illinois court has explicitly examined the import of the words "unworthy", "incompetent", and "dishonest dealing" in the License Act. Several other jurisdictions have considered whether similar terms in other licensing statutes encompass racially discriminating conduct.

The Wisconsin Supreme Court in *Ford v. Wisconsin Real Estate Examining Board* (1970), 48 Wis. 2d 91, 179 N.W.2d 786, held that the State Board was without authority to discipline a licensee for racial discrimination. The Wisconsin Act permitted the suspension or revocation of a license when a salesman or broker had:

> " '(i) Demonstrated untrustworthiness or incompetency to act as a broker, salesman or cemetery salesman in such manner as to safeguard the interests of the public;
> * * *
>
> (k) Been guilty of any other conduct, whether of the same or a different character from that specified herein, which constitutes improper, fraudulent or dishonest dealing.' " (48 Wis. 2d 91, 106, 179 N.W.2d 786, 794.)

The *Ford* decision relied on Wisconsin precedents which construed those sections to an exiguous scope in an effort to rescue the statute from constitutional challenges that its standards were too vague. The terms "trustworthiness" and "compentency" were defined in past cases as trustworthy in a financial sense and competency in the sense of being educationally qualified. "Improper, fraudulent or dishonest dealing" was restricted to the taking of unfair financial advantage. The *Ford* court refused to expand these definitions to include racial discrimination.

A narrow reading of the similar standards in the Illinois License Act does not follow. No past Illinois cases circumscribe the broad terms of subsections 11 and 15. On the contrary, Illinois courts have tended to be expansive in their interpretations of criteria in laws which promote the public welfare. (*May v. Pollution Control Board* (1976), 35 Ill. App. 3d 930, 342 N.E.2d 784.) In the absence of explicit definitions, broad guidelines in professional licensing statutes have been held to reflect the standards of the profession concerned. *Gordon v. Department of Registration & Education* (1970), 130 Ill. App. 2d 435, 264 N.E.2d 792.

In *McKibbin v. Corporation & Securities Com.* (1963), 369 Mich. 69, 119 N.W.2d 557, the Michigan Supreme Court refused to construe the words "dishonest or unfair dealing" to encompass racially discriminatory

conduct. Such a construction, the court held, without a precise statement of legislative policy within the statute, would violate Michigan's constitution as a delegation of legislative power.

The rationale of *McKibbin* is not appropriate in Illinois. The Illinois Supreme Court has held that a standard is sufficient for an agency to guide the exercise of its discretion and for a court to evaluate that discretion on review if it describes:

"(1) The *persons* and *activities* potentially subject to regulation;

(2) the *harm* sought to be prevented; and

(3) the general *means* intended to be available to the administrator to prevent the identified harm." (*Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 372, 369 N.E.2d 875, 879.)

The court has upheld as constitutional legislation which prohibits conditions in insurance policies which "unreasonably or deceptively" affect risks (*Stofer*, 68 Ill. 2d 361, 374, 369 N.E.2d 875, 880); it has found "the welfare of such person and the community," an adequate standard for the discharge of mental patients (*Hill v. Relyea* (1966), 34 Ill. 2d 552, 556, 216 N.E.2d 795, 797); it has been able to gauge the discretion of an administrator under terms which required evaluation of "the health and safety of pupils" (*Board of Education v. Page* (1965), 33 Ill. 2d 372, 376, 211 N.E.2d 361, 363).

It also should be noted that the Michigan Supreme Court, although not citing *McKibbin*, discounted the need for specific legislative policy statements within a statute in *Beech Grove Investment Co. v. Civil Rights Com.* (1968), 380 Mich. 405, 157 N.W.2d 213. The court found, in that case, authority for an agency to hear a complaint against a real estate broker for discriminatory housing sales in the State's common law policy of promoting racial tolerance.

This latter approach was also employed by New York courts in reading that State's real estate licensing Act. The New York Act lists "demonstrated untrustworthiness" as a cause for suspension or revocation of a license. The New York courts construe this term to forbid racially discriminatory practices by real estate salesmen. (*In re Diona* (1966), 26 App. Div. 2d 473, 275 N.Y.S.2d 663; *In re Birch* (1969), 31 App. Div. 2d 835, 298 N.Y.S.2d 281; *In re Kamper* (1936), 26 App. Div. 2d 697, 272 N.Y.S.2d 808.) Further, the prohibited conduct which demonstrates untrustworthiness comprehends racially directive sales practices which promote segregation and disharmony. *In re Butterly & Green, Inc.* (1975), 36 N.Y.2d 250, 367 N.Y.S.2d 230, 326 N.E.2d 799.

The *Diona* court stated that other New York statutes declaring discrimination repugnant to its citizens and to the health, safety and welfare of the State's inhabitants:

"* * * are of legitimate concern to government. The State has

power to enact laws safeguarding its peace and security, including laws prohibiting discrimination [citation]. Knowledgeable violation of state law and policy is a factor which properly may be considered by the licensing authority, an agency of government, in determining untrustworthiness. The State also has power to require licensing of brokers [citation] and to establish reasonable conditions for the maintenance of such license. The purpose * * * in the licensing of brokers and salesmen is 'to assure by means of licensing competency and the observance of professional conduct on the part of real estate brokers and salesmen' [citation]. 'The real estate broker is brought by his calling into a relation of trust and confidence' [citation], and demonstrated misconduct in disregard of law and public policy may be considered in determining untrustworthiness." (26 App. Div. 2d 463, 477, 275 N.Y.S.2d 663, 667, 668.)

The *Diona* court found the term "untrustworthiness" to be flexible, not vague, evincing a legislative intent to have an agency evaluate its meaning through the application of State policies. Such a system rather than promoting unfettered administrative discretion satisfied due process through the safeguards of judicial review and a requirement of a hearing with a specific factual presentation by the charging agency

"* * * concerning acts or conduct by the licensee or his agent as would warrant a conclusion of unreliability, and which establishes that any confidence or reasonable expectation of fair and unbiased dealing with the general public is misplaced." 26 App. Div. 2d 473, 477, 275 N.Y.S.2d 663, 668.

Illinois courts have also rejected challenges to laws on the basis of vagueness and unconstitutional delegations of power through the recognition of procedural protections against arbitrary agency action. In *City of Waukegan v. Pollution Control Board* (1974), 57 Ill. 2d 170, 311 N.E.2d 146, for example, the test for evaluating delegations of power was articulated as the presence, in the law, of intelligible standards guiding the discretion of an agency, judicial review of agency action and procedural safeguards.

In addition, the Illinois definition of public interest, as in New York, can be said to contain a strong public policy against discrimination in the sale or rental of property. Article 1, section 17 of the 1970 Illinois constitution provides:

"All persons shall have the right to be free from discrimination on the basis of race, color, creed, national ancestry and sex in the hiring and promotion practices of any employer or in the sale or rental of property.

These rights are enforceable without action by the General

Assembly, but the General Assembly by law may establish reasonable exemptions relating to these rights and provide additional remedies for their violation."

Certainly a law establishing standards of conduct for real estate salesmen must be read to incorporate relevant constitutional provisions. (See *City of Waukegan*, 57 Ill. 2d 170, 183, 311 N.E.2d 146, 153.) Practices which contravene the constitutional policy of nondiscriminatory sale and rental of property, as in New York a violation of State law, could be a factor considered in a suspension order by the licensing authority charged with maintaining professional standards. Indeed, to exclude knowledge of this constitutional provision from the professional standards of licensed real estate salesmen may defeat the right it establishes.

■■ It is a reasonable reading of the statutory standards "unworthy" and "dishonest dealing" to find that they prohibit discriminatory conduct. A precise definition of those terms by a review court is not necessary in this instance. In light of the broad public interest purpose of the Act set forth in section 101, the legislature has assigned that task to the Department and its Director, who are charged with the Act's enforcement. Determination of unworthiness to act as a salesman "in such a manner as to safeguard the interests of the public" (subsection 11) and conduct constituting dishonest dealing "whether of the same or different character" as described in other sections (subsection 15) requires an expertise, a familiarity with the various types of sales techniques and approaches and the needs of the areas in which those techniques are practiced. The experience of the Department in these matters must be brought to bear on the question of what is unworthy behavior or dishonest dealing under the Act. Resolving that question, like determining who should receive a license in the first place, belongs to the usual administrative routine. A reviewing court's function is to see if the agency had a reasonable basis in law to interpret the statutory terms to prohibit the conduct.

■■■ The Department and the Director, based on the testimony of Pudel, found that Ranquist, while working as a real estate salesman, through his volunteered comments about the racial composition of neighborhoods, consciously directed the Pudels away from Morgan Park. The steering of one race away from integrated neighborhoods can be detrimental to the stability and safety of a community. Such overt manipulation of the population of an area may be against the public interest. Deliberate discouragement of real estate customers from certain areas because of race may unfairly influence the housing market. Conduct of that sort may be intolerable when practiced by a State sanctioned salesman, to the extent that the salesman may be said to be *unworthy* of his license. This is cause under section 115(e) subsection 11 for a license

suspension. Unsubstantiated comments of the type the Examining Committee found Ranquist made about the quality of a neighborhood because they are made by a licensed professional salesman, can constitute misrepresentation bordering on inequitable and fraudulent bargaining. That type of conduct is not beyond the understood meaning of dishonest dealing, controlled by section 115(e), subsection 15.

This court is urged to adopt the holding in *Quinlan & Tyson, Inc. v. City of Evanston* (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65, characterized as a ruling that racial steering is "punishable" only under a statutory provision specifically making it an "offense." *Quinlan and Tyson* did not so hold. In that case a court interpreted a narrow, unambiguous city ordinance, which forbids a real estate broker to refuse to show property to prospective customers on account of race, religion, origin or color, to only prohibit conduct which actually included an outright refusal and failure to show property for those reasons. The conduct at question in the case did not include such a refusal; the court, therefore, would not apply the statute to the situation. The *Quinlan and Tyson* court clearly distinguished such a specifically worded ordinance from statutes which controlled practices of real estate brokers and salesmen with broad statutory standards. The latter type of law, the court noted, could be read to prohibit a salesman from influencing the choice of a prospective home buyer on a racial basis. *Quinlan & Tyson*, 25 Ill. App. 3d 879, 892, 324 N.E.2d 65, 75.

■■ It is Ranquist's position that, if one accepts Pudel's testimony, his conduct only amounted to racial steering and that real estate salesmen were free to engage in racial steering prior to September 5, 1974, the day the amendments explicitly forbidding such practice became operative, the day after the Pudels visited McKey and Poague. The Examining Committee and the Director found Ranquist's conduct within the ambit of the proscriptions of the unamended law. It is a presumption of statutory construction that an amendment to a law changes that law. (*Kaplan v. Department of Registration & Education* (1977), 46 Ill. App. 3d 968, 361 N.E.2d 626.) However, this inference is not conclusive; it may be overcome by persuasive considerations. (*Bruni v. Department of Registration & Education* (1974), 59 Ill. 2d 6, 319 N.E.2d 37, *cert. denied* (1975), 421 U.S. 914, 43 L. Ed. 2d 780, 95 S. Ct. 1573.) We find article 1, section 17 of the Illinois Constitution, effective since 1970, such a consideration. The fact that the legislature subsequently codified the licensing Act to clarify and reflect the policy of nondiscriminatory property sales cannot operate to lessen the vigor of the constitutional mandate.

Since we find that conduct such as Ranquist is alleged to have committed is a violation of the applicable licensing Act, the remaining

issues are whether the Department and Director's decision to suspend his license for 60 days was against the manifest weight of the evidence and unsupported by substantial evidence. Pudel testified on direct examination that the plaintiff made false statements about the racial makeup of his neighborhood designed to discourage a prospective white customer from looking for a home in that area. Ranquist denied making those statements. In cases where testimony is conflicting it is the duty of the fact finder to evaluate the credibility of the witnesses. (*Lo Piccolo v. Department of Registration & Education* (1972), 5 Ill. App. 3d 1077, 284 N.E.2d 420.) The mere fact that evidence is conflicting is not sufficient reason to warrant reversal by a review court. (*Hruby v. Board of Fire & Police Commissioners* (1974), 22 Ill. App. 3d 445, 318 N.E.2d 132; *Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill. App. 3d 864, 278 N.E.2d 212.) The Real Estate Examining Committee believed the testimony of Pudel over that of Ranquist. We find the evidence of sufficient quality and quantity to sustain the decision to suspend Ranquist's license.

The decision of the circuit court is reversed and the order by the Director of the Department of Registration and Education, suspending the real estate salesman's license of William E. Ranquist for 60 days, is reinstated.

Reversed.

SIMON, P. J., and McGILLICUDDY, J., concur.