NATIONAL CONSOLIDATED INDUSTRIES, LTD., Plaintiff-Appellant and Cross-Appellee, v. THE DEPARTMENT OF INSURANCE, Defendant-Appellee.—(ILLINOIS VISION SERVICES, INC., Intervenor-Defendant-Cross-Appellant.)

First District (2nd Division)   No. 78-703

Opinion filed June 26, 1979.

Epton, Mullin, Miller & Druth, Ltd., of Chicago (Saul A. Epton, Lawrence A. Berman, and Roger A. Bixby, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Gregory G. Lawton, Assistant Attorney General, of counsel), for appellee.

Martin Craig, of Chester & Sonnenschein, of Chicago (Donald E. Tolva and Thomas B. Cassidy, of counsel), for cross-appellant.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

National Consolidated Industries, Ltd. (hereinafter "NCI") appeals from that part of an order of February 21, 1978, affirming the decision of the Department of Insurance (hereinafter "department") by its then Director finding it subject to the Illinois Vision Service Plan Act (Ill. Rev. Stat. 1975, ch. 32, par. 651 *et seq.*) (hereinafter "Act"). Illinois Vision Services, Inc. (hereinafter "IVS"), cross-appeals from that part of the same order reversing the department's decision permitting it to intervene in the administrative proceedings below.

For the reasons hereinafter stated, we affirm.

In April of 1976, the department notified NCI that pursuant to section 10 of the Act (Ill. Rev. Stat. 1975, ch. 32, par. 660) and sections 401, 402 and 403 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, pars. 1013, 1014 and 1015), a hearing would be held to determine whether it was "* * * engaging in unlawful acts and practices in violation of sections 3 and 8 of the * * * Act (Ill. Rev. Stat. 1975, ch. 32, pars. 653 and 658) * * *" by operating a vision service plan without being incorporated or chartered under the Act. Prior to the hearing IVS sought to intervene in the proceedings, alleging that it was chartered, licensed and operating under the Act; that it had encountered competition from NCI; and that it stood to be adversely affected by a final order pursuant to a hearing. Intervention was allowed on June 15, 1976.

The hearing was held on April 15, 1977. Dr. Bernard Koenig, chairman of NCI, was called as a witness by the department. His testimony was as follows: NCI was a corporation organized under the laws of Delaware and had begun doing business in Illinois in 1971. It provided professional optometric services, including eye examinations and prescriptions and fitting of eyeglasses and contact lenses, through four outlets located in the Chicago metropolitan area and staffed by 16 to 18 persons each. It employed four licensed optometrists, paid on a weekly salary basis, who were free to do other professional work on an independent basis, but did not do so at the time of the hearing.

NCI provided the bulk of its services to the employees of one corporation and those of other businesses represented by two labor unions, having written agreements with the corporation and unions in question. One of these agreements admitted into evidence, between NCI and Local No. 743 of the Warehouse, Mail Order, Office, Technical and Professional Employees Union, International Brotherhood of Teamsters (hereinafter "union"), was represented by Dr. Koenig as typical of the others. By its terms NCI provided its prepaid optical services program to all persons for whom the union acted as collective bargaining agent. Under the program, embodied in a document attached to NCI's agreement with the union and the basis of each of its contracts, employees were charged only for "cosmetic" items such as prescription sunglasses and contact lenses. The benefits were detailed in a booklet prepared by NCI and distributed to union members.

NCI was paid on a monthly basis by the employers with whom the union had collective bargaining contracts. At the time of the hearing, the cost to employers was $1.15 per week for employees with a spouse or dependents and $.62 per week for single employees. These figures were produced by NCI through a statistical determination of the number of

people in a normal family group, followed by a projection of the frequency of use of optical services based on that determination. NCI's expenses in providing the services contracted for were then estimated in order to arrive at the cost of the plan to employees. Dr. Koenig acknowledged that if as the result of a miscalculation payments from employers were insufficient to cover its expenses, NCI would have been required to "go off payroll" to fulfill its agreements. No reserved funds were maintained to cover such a contingency.

Dr. Koenig was the only witness to testify at the hearing. NCI made no claim at the hearing or thereafter to being incorporated under the Act or to having otherwise complied with its terms.

The hearing officer found, *inter alia*, that intervention by IVS was proper; that NCI was doing business as a vision service plan as contemplated by the Act and did not qualify for any of the exemptions provided for therein; and that NCI was not incorporated under the provisions of the Act and consequently in violation of section 3, which makes operation of a vision service plan "* * * unlawful for any person, except a * * * corporation incorporated under this Act * * *" (Ill. Rev. Stat. 1975, ch. 32, par. 653). He recommended that NCI be ordered to cease and desist from operating its plan in Illinois until chartered pursuant to the Act. On October 4, 1977, the then Director of the department adopted the findings and recommendations of the hearing officer and ordered NCI accordingly.

NCI sought judicial review of said order pursuant to the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*). On February 21, 1978, the circuit court found the department's position "* * * supported by the evidence in the record and * * * in accordance with the law * * *" in all but intervention by IVS and affirmed the Director's decision except as to the latter issue. This appeal followed.

NCI's two pronged argument is that its operation does not constitute a vision service plan within the intendment of the Act, or, that if it does, it is nonetheless exempt from the requirements of the Act under section 3. Its initial claim is grounded in the following definition contained in section 2(b) of the Act (Ill. Rev. Stat. 1975, ch. 32, par. 652(b)):

> " 'Vision service plan' means a plan or system under which vision service may be rendered to a subscriber or other beneficiary by a qualified optometrist or qualified clinic, *at the expense of a vision service plan corporation*, in consideration of prepayments made or contracted future payments to be made by or on behalf of a subscriber." (Emphasis added.)

Based upon the emphasized language, NCI avers that since it provides goods and services to its clients through its own employees, rather than by

arrangement with a third party, "vision service" is not rendered at its expense. In this respect NCI attempts to distinguish in terms of the Act's coverage between service plans (in which reimbursement is made by the service plan corporation directly to a separate provider of services) and insurance plans (in which the recipient of the services pays the provider thereof and is in turn reimbursed by the insurance company) on one hand, and NCI's operation on the other: the latter never involves a separate financial intermediary holding prepayments to be dispersed to others since NCI's own employees provide the ultimate goods and services. By this argument the "at the expense" phrase of section 2(b) is mere surplusage unless construed as excluding from coverage under the Act a plan like NCI's in which the corporation itself provides the vision services.

NCI also points to the definition of "subscription certificate" contained in section 2 of the Act, which provides that such certificate shall contain, *inter alia,* "\* \* \* conditions upon which a vision service plan corporation *shall be liable to pay* for vision service rendered \* \* \*" (Ill. Rev. Stat. 1975, ch. 32, par. 652(f)) (emphasis added). According to NCI, the emphasized phrase further evinces a legislative intention that services under a plan covered by the Act be rendered on a "fee-for-service" basis rather than by a company's own employees.

In our view this argument is grounded in a misapprehension of the Act's evident purposes. While the Act contains no explicit statement of goals, its fundamental purposes are reflected in the following language from section 8 of the Act, comprising those conditions which must be found to obtain before the Director shall issue a charter to an applicant corporation (Ill. Rev. Stat. 1975, ch. 32, par. 658):

"(a) The corporation has complied with the requirements of this Act,

(b) The amount of money actually available for working capital is sufficient to carry all acquisition costs and operating expenses for a reasonable period of time from the issuance of the charter and is not less than $10,000.00,

(c) The amounts contributed as working capital of the corporation are repayable without interest and only out of the surplus earnings of the corporation,

(d) Adequate and reasonable reserves to insure the majority of the contracts are provided, and

(e) At least a majority of the eligible practitioners in Illinois have agreed to become participating practitioners and to render the vision services for which the corporation agrees to pay \* \* \*."

With respect to the immediate effect upon the public interest, two major

concerns emerge from these requirements: that the corporation have sufficient monetary reserves to insure the performance of its contractual obligations, and that beneficiaries have the opportunity to choose from a significant plurality of available practitioners in using the vision services provided. NCI does not offer any distinction between the services it provides and "* * *" the ordinary and usual professional services rendered by optometrists * * *", as "vision service" is defined in the Act (Ill. Rev. Stat. 1975, ch. 32, par. 652(c)); nevertheless, it failed to meet either of the aforesaid concerns of the Act by maintaining reserved funds or providing its services through more than a few practitioners.

We regard the distinction proposed by NCI between its own operation and "indemnity-type schemes of service plans and insurers" as unpersuasive in this context. Like the insurance or service plan arrangements it attempts to distinguish, NCI's operation is essentially of a risk-bearing nature: actuarial data is used to calculate estimated use of services, and NCI sets its rates accordingly; once payment is made by an employer NCI bears the burden of providing these services as needed, even if actual use is in excess of what was anticipated. In this regard the concluding part of the definition of "vision service plan" following the disputed phrase, "at the expense of a vision service plan corporation," deserves attention: "* * * in consideration of *prepayments made or contracted future payments to be made* by or on behalf of a subscriber." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 32, par. 652(b).) The highlighted words emphasize that the terms of payment by subscriber to corporation must be established prior to the actual rendering of services. It thus appears that the essential element in those plans described in and covered by the Act is the shift of risk of loss from one to the other, rather than the presence of a provider of services distinct from the corporation. ■■ In light of the purposes of the Act as reviewed hereinabove, this risk-bearing and risk-shifting character common to NCI's plan and those it attempts to distinguish is far more cogent than whether those providing the services are NCI's employees or independent contracts. Seen from this perspective the "at the expense" phrase in section 2(b) of the Act does no more than make explicit that the vision plan corporation is to be on the receiving end of this risk-shifting transaction. Irrespective of the fact that it provides the services contracted for itself, NCI does assume the risk of loss under its plan and thus appears to be properly covered by the Act.

It is fundamental that the primary object in construing any statute is to give effect to the legislative intent. (*People ex rel. Morrison v. Sielaff* (1974), 58 Ill. 2d 91, 316 N.E.2d 769.) To read into the Act a preclusion from its coverage based upon the distinction put forward by NCI would, as acknowledged by its counsel during oral argument, leave it effectively

free of regulation in the performance of services subject in any other context to the provisions of the Act. Such a reading is plainly contrary to the spirit if not the letter of the Act and consequently untenable. See *Lincoln National Life Insurance Co. v. McCarthy* (1957), 10 Ill. 2d 489, 494, 140 N.E.2d 687; *County of McHenry v. Duenser* (1977), 49 Ill. App. 3d 125, 129, 363 N.E.2d 1197.

This construction is entirely in accord with the plain meaning of the language in issue and the Act as a whole, as well as consonant with the interpretation of the department, which is entitled to great weight in our own consideration. (*Hofmeister v. Department of Registration & Education ex rel. Galvin* (1978), 62 Ill. App. 3d 777, 379 N.E.2d 383; *Bruns v. Department of Registration & Education* (1978), 59 Ill. App. 3d 872, 376 N.E.2d 82; *Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 370 N.E.2d 1198.) We perceive no distinction other than semantic between the concept of NCI's "cost of service" in meeting its contractual obligations, acknowledged by Dr. Koenig as a material factor in the determination of its charge to employers, and the concept embodied by the "at the expense" phrase of section 2(b) in the context of the entire Act.

■■ NCI's argument includes a lengthy discussion of the "legislative history" of related enactments and service plans in general, though largely without reference to statutory or judicial authority. Legislative history and other interpretive aids are relevant to perceive legislative intent only when the statutory language at issue is itself unclear or otherwise inadequate. (*Hetzer v. State Police Merit Board* (1977), 49 Ill. App. 3d 1045, 365 N.E.2d 261; *Illinois Power Co. v. Mahin* (1977), 49 Ill. App. 3d 713, 364 N.E.2d 597; *Blough v. Ekstrom* (1957), 14 Ill. App. 2d 153, 144 N.E.2d 436.) As noted above, we find the relevant language of the Act plain on its face and consequently in no need of secondary authority for explication.

NCI's secondary contention is that, even if generally subject to the Act, it qualifies for the exemption provided for in section 3, reading in pertinent part as follows (Ill. Rev. Stat. 1975, ch. 32, par. 653):

> "It shall be unlawful for any person, except a vision service plan corporation incorporated under this Act, to establish, maintain or operate a vision service plan. This prohibition, however, shall not be construed * * * as preventing a person from furnishing vision services to *his employees* * * *." (Emphasis added.)

The highlighted phrase would appear to be applicable to NCI only in regard to its own employees rather than those of its clients. Nevertheless, relying principally upon *B & L Pharmacy, Inc. v. Metropolitan Life Insurance Co.* (1970), 46 Ill. 2d 1, 262 N.E.2d 462, NCI claims that the exclusion embodied in the language quoted hereinabove applies also to itself as provider of services to the employer.

In *B & L Pharmacy*, the supreme court considered, *inter alia*, the Pharmaceutical Service Plan Act (Ill. Rev. Stat. 1969, ch. 32, par. 691.1 *et seq.*) in relation to a plan implicitly presented by NCI as comparable to its own and found that "* * * the exemption in the Pharmaceutical Service Plan Act for employers who provide prescription drug services to their employees is applicable to the MediMET plan." (46 Ill. 2d 1, 10.) The MediMET plan had been produced through negotiations between a union and an employer to provide prescription drug services to employees, and the employer insured its obligations under the plan with Metropolitan Life Insurance Company. (46 Ill. 2d 1, 3.) NCI's position appears to be that, inasmuch as the Act contains a similar exemption, it is applicable to NCI under the reasoning of this case.

Initially we note that the court in *B & L Pharmacy* mentions the Act along with other service plan legislation in relation to the Pharmaceutical Service Plan Act and the MediMET plan only apropos the observation that "* * * they [all] contemplate Participating Providers who agree to furnish health services to subscribers for fees fixed by the corporation which promotes and manages the plan." (46 Ill. 2d 1, 9.) No construction is made of the Act in general or its employer exemption in particular. As noted above, the court's interpretation of legislation *in pari materia* would be relevant here only if the meaning of the Act in this respect were unclear (*Hetzer; Mahin; Blough*); NCI does not argue any uncertainty to the effect of the pertinent language of section 3, nor do we find any.

■■ Even in substance, however, the argument from analogy to the plan considered in *B & L Pharmacy* is without merit. The MediMET plan was the individual product of negotiation between the employer and the collective bargaining agent; the insurer was involved as underwriter of the employer's obligations. The plan at issue in the present case is the product neither of the employer of its beneficiaries nor of individual negotiations between an employer and NCI; rather, it was developed by NCI as the basis of its relationship with a number of clients. The court in *B & L Pharmacy* did not extend the exemption there in issue to a plan created and operated by a third party, nor do we do so here as to the employer exemption of section 3 of the Act. The department's interpretation of the employer exemption of section 3 as applying to NCI only in respect to its own employees accords with the plain meaning of the language used, "* * * always the safest guide to follow in construing any act * * *." (*Hagen v. City of Rock Island* (1959), 18 Ill. 2d 174, 179, 163 N.E.2d 495.) Accordingly, we find that the exemption in question does not apply and that NCI is subject to the requirements of the Act.

In light of our disposition of this case, we find it unnecessary to discuss the question of intervention by IVS and we therefore express no opinion as to that issue.

824

The judgment of the circuit court is affirmed and our order of June 16, 1978, staying said judgment is hereby vacated.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.